ELECTRICAL CONTRACTORS, INC., ET AL. *v.*
DEPARTMENT OF EDUCATION ET AL.
(SC 18525)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan,
Eveleigh and Harper, Js.

Argued September 6, 2011—officially released January 17, 2012

*Steven B. Kaplan,* with whom was *Paul R. Fitzgerald,* for the appellants (plaintiffs).

*Darren P. Cunningham,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* former attorney general, for the appellees (named defendant et al.).

*Frank G. Usseglio* and *John T. Fussell,* with whom were *Karen K. Clark* and *Glenn A. Duhl,* and, on the brief, *Robert M. Cheverie* and *Gary F. Sheldon,* for the appellees (defendant city of Hartford et al.).

*Opinion*

ZARELLA, J. The principal issue in this appeal is whether the nonunion plaintiffs, Electrical Contractors, Inc. (ECI), and six of its individual employees,[1] have standing to challenge prebid specifications requiring the successful bidder on two state financed school construction projects[2] in the city of Hartford to perform all project work with union labor under the terms of a project labor agreement (PLA). The plaintiffs claim that the trial court incorrectly concluded that (1) ECI lacked standing, pursuant to this court's decision in *Connecticut Associated Builders & Contractors* v. *Hartford,* 251 Conn. 169, 740 A.2d 813 (1999) (*Associated Builders & Contractors*), to challenge the PLA requirement and the rejection of its lowest, responsible, qualified bids on the two construction projects after ECI refused to sign and be bound by the mandatory PLA, (2) the PLA requirement did not violate the applicable competitive bidding laws, General Statutes §§ 4a-100, 4b-91, 4b-92

---

[1] The six individual plaintiffs, none of whom wish to join, pay dues or be required to support the political activities of the local electrical workers union, the International Brotherhood of Electrical Workers, are Jose L. Gonzalez, Jose G. Maldonado, Dan Czyzewski, Bradley Wheaton, Craig Busca and Sean Smith.

[2] The two Hartford schools are Capital Preparatory Magnet School and Annie Fisher Magnet School.

and 10-287, (3) the individual plaintiffs did not have standing under article first, §§ 1, 4, 5 and 20, of the Connecticut constitution to challenge the PLA requirement, and (4) ECI did not have standing to prosecute its claim that the PLA requirement was in violation of the Connecticut Antitrust Act, General Statutes § 35-24 et seq. The defendants, the city of Hartford (city), Morganti Group, Inc., Downes Construction Company, LLC, Custom Electric, Inc.,[3] the state department of education (department), and Mark K. McQuillan, the commissioner of education,[4] who allegedly approved the challenged contracts on behalf of the state,[5] disagree with the plaintiffs and raise two alternative grounds for affirmance, namely, that the plaintiffs' claims are (1) preempted by federal labor law, and (2) barred by the doctrine of sovereign immunity.[6] We affirm in part and reverse in part the judgment of the trial court.

I

FACTS

The following relevant facts are set forth in the trial court's memorandum of decision. "A PLA is a prehire collective bargaining agreement which requires all contractors and subcontractors on a construction project

---

[3] The city imposed the specifications and enforced the PLA requirement against ECI in rejecting its low bids. Morganti Group, Inc., and Downes Construction Company, LLC, served as the city's construction managers on the projects.

We refer to the city, Morganti Group, Inc., Downes Construction Company, LLC, and Custom Electric, Inc., collectively as the nonstate defendants.

[4] We refer to the department and McQuillan collectively as the state defendants.

Dicin Electric Company also was named as a defendant. The plaintiffs, however, subsequently withdrew their claims against Dicin Electric Company.

[5] The state provided 90 percent of the financing for the school construction projects.

[6] The federal preemption claim is raised by the nonstate defendants. The sovereign immunity claim is raised by the state defendants.

to comply with the terms of all existing collective bargaining agreements with unions representing workers from the trades performing work on the project and requires all project workers to join the unions for their respective trades, to remain members in good standing of such unions, and not to strike while the project is under construction.[7] The PLAs . . . at issue share these essential features, although they set aside 15 percent of all work on each project for minority-owned . . . and/or women-owned . . . business enterprises, which are not bound by the PLAs.[8] . . .

---

[7] See *Connecticut Associated Builders & Contractors* v. *Hartford,* supra, 251 Conn. 176 (describing PLA in that case as prehire agreement signed by construction manager, local unions and contractors for purpose of enhancing timely completion of project without interruption or delay through establishment of framework for labor-management cooperation and stability, with terms remaining in full force and effect throughout project, contractors agreeing to abide by collective bargaining agreements of trade unions, including making contributions to employee benefit trust funds and recognizing trade unions as sole collective bargaining representatives of employees working on project, and unions agreeing not to engage in any strike, slowdown or other disruption of work, but not requiring all project workers to be members of union); cf. *New York State Chapter, Inc., Associated General Contractors of America* v. *New York State Thruway Authority,* 88 N.Y.2d 56, 65, 666 N.E.2d 185, 643 N.Y.S.2d 480 (1996) ("[A] PLA is a prebid contract between a construction project owner and a labor union [or unions] establishing the union as the collective bargaining representative for all persons who will perform work on the project. The PLA provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work. A PLA thus generally requires all bidders on the project to hire workers through the union hiring halls; follow specified dispute resolution procedures; comply with union wage, benefit, seniority, apprenticeship and other rules; and contribute to the union benefit funds. In return for a project owner's promise to insist in its specifications that all successful bidders agree to be covered by a PLA, the union promises labor peace through the life of the contract . . . ." [Citation omitted.]).

[8] The challenged PLAs in the present case, which are described in detail in paragraphs twenty-eight through thirty-six of the plaintiffs' second amended complaint, required that the successful bidder on each project "draw all of its field labor through referrals from a designated trade union, or that its [nonunion] employees must first join a designated trade union, as a prerequisite to executing a contract and performing the subject work." The PLAs also required, inter alia, that the successful bidder (1) abide by the " 'Project Work Rules for the Greater Hartford-New Britain Building and Construction Trade Council and its affiliated [u]nions and the [c]ity of Hartford, Hartford Public Schools Construction, Renovations and Additions Program' dated [April 14, 2004]," (2) ensure that all of its field employees working on each project remain members in good standing of the relevant union during the term of the applicable PLA, (3) agree to participate in a "Labor Management

"In their complaint, the plaintiffs [sought] several types of declaratory, injunctive and other extraordinary relief[9] in connection with the projects . . . at issue based upon the common underlying claim that the city's imposition of mandatory PLAs upon successful bidders on those and similar state-financed construction projects is illegal. . . .

Cooperative Committee" and "submit to and comply with all rulings promulgated by [that committee and by] the PLA's Joint Administrative Council," (4) pay wages and fringe benefits to all workers on the project in accordance with the prevailing union scale, (5) recognize the building trades council and its affiliated local unions as the sole and exclusive bargaining representatives for building trades mechanics and laborers employed on the projects and covered by their respective PLAs, (6) pay any person referred by the union whom it rejected for work on the project, as was its right, for " 'reporting time' " even though the rejected person had performed no work on the project, and (7) deduct union dues from each field employee's pay and send it to the union on a monthly basis.

[9] The trial court described the requested relief as follows: "In particular, [the plaintiffs sought] (1) [a declaration] that the imposition of mandatory PLAs, by or on behalf of the city, on projects approved and funded by the state defendants is illegal and improper insofar as PLAs restrict the performance of work on the projects, in whole or in part, to union member employees, union-referred employees, union contractors or PLA signatory contractors, (2) a [declaration] that the imposition of a mandatory PLA, by or on behalf of a public owner, that restricts the performance of work to union member employees, union-referred employees, union contractors or PLA signatory contractors for any municipal school construction project that is funded, in whole or in part, [under] . . . § 10-287, is illegal, (3) [a declaration] that ECI's bids on the two projects were the lowest qualified responsible bids, and thus that the city's rejection of those bids, based upon ECI's refusal to agree to PLAs, was illegal and improper, (4) writs of mandamus ordering the city to award and execute contracts for the electrical work on each of the two projects to ECI, (5) an injunction ordering the city and its construction managers not to execute any contract to perform electrical work on either of the two projects with any other contractor than ECI, (6) an injunction ordering the state defendants not to provide any funds in furtherance of the work on the two projects by any other electrical contractor than ECI, (7) a writ of mandamus ordering the state defendants to withhold funds in furtherance of the work on the two projects by any electrical contractor other than ECI, and (8) a writ of mandamus ordering the state defendants to withhold any funds in furtherance of work performed on any school construction project that is funded, in whole or in part, with state funds, [pursuant to] . . . § 10-287, for which a mandatory PLA of the type . . . at issue has been imposed. In addition to the foregoing, the plaintiffs [sought] the following types of monetary relief: (1) from the . . . city, damages under General Statutes § 35-34 for ECI's lost profits and bid preparation costs on the two projects and for the individual plaintiffs' lost wages and benefits, plus treble damages, reasonable attorney's fees and costs under General Statutes § 35-35, and (2) from all but the state defendants, such other monetary relief as is allowable by law,

"After this case was filed in [the trial] court, the defendants successfully petitioned for its removal to the United States District Court [for the District of Connecticut] so that [the] federal constitutional claims . . . could be adjudicated in a federal forum. Upon its removal, the case was assigned to [Judge] Stefan Underhill, before whom the parties presented oral arguments after submitting extensive briefs on comprehensive motions to dismiss[10] all counts of the plaintiffs' then operative first amended complaint.[11] At the conclusion of oral argument, Judge Underhill dismissed all of the plaintiffs' federal claims, declined to exercise jurisdiction over their pendent state claims, and ordered that the case be remanded to [the trial] court for further proceedings. Left undecided in this process, with the express intention that [the trial] court should decide them on remand, were the defendants' jurisdictional challenges to the plaintiffs' state law claims.

"After the case was remanded, the [trial] court met with counsel to establish a procedure for identifying those jurisdictional challenges that remained to be adjudicated, claiming such challenges for a hearing, and filing supplemental briefs thereon. Upon receipt of the parties' claims for hearing and supplemental briefs, which incorporated by reference all relevant portions of the briefs they had previously filed in federal court, the [trial] court heard oral argument on all challenges

including but not limited to lost profits, bid preparation costs, reasonable attorney's fees and costs."

[10] These included the motion to dismiss, dated March 27, 2009, filed by the city, Downes Construction Company, LLC, and Morganti Group, Inc., the motion to dismiss, dated March 27, 2009, filed by Dicin Electric Company and Custom Electric, Inc., and the motion to dismiss, dated April 17, 2009, filed by the department before McQuillan was joined as a defendant on June 15, 2009. Two separate stipulations of facts, one entered into by the city and the plaintiffs and another entered into by the department and the plaintiffs also were filed with the United States District Court on February 27, 2009, in connection with this action.

[11] The plaintiffs filed the currently operative second amended complaint on May 20, 2009, following remand by Judge Underhill to the Connecticut Superior Court.

claimed for hearing on July 3, 2009. For the purpose of that hearing, the parties agreed that all documents and materials submitted by any party could be considered parts of the evidentiary record upon which to decide the contested issues presented on the pending motions.

"The defendants, in their motions [to dismiss] . . . challenged [the trial] court's subject matter jurisdiction over the plaintiffs' state law claims on three separate grounds. First, they claim[ed] that the plaintiffs lack[ed] standing to bring a bid protest under settled principles of Connecticut common law, as most recently applied . . . in [*Associated Builders & Contractors*] . . . . Second, the state defendants argue[d] that the plaintiffs' claims against them [were] barred by the doctrine of sovereign immunity because such claims do not rest upon allegations which, if proved, would establish that their conduct in this case was clearly in excess of their statutory authority. Third, all defendants join[ed] in claiming that the plaintiffs' general challenge to the use of PLAs in state funded municipal school construction projects [was] preempted by federal labor law, which has long approved of their use [in] public construction projects."

Following the hearing, the trial court agreed with the defendants that the plaintiffs lacked standing and that the action should be dismissed for lack of subject matter jurisdiction. In its memorandum of decision, the court concluded that ECI had failed to make a colorable claim that the PLA requirement effectuated fraud, corruption, favoritism or otherwise undermined the objective or integrity of the competitive bidding process under the common-law principles articulated in *Associated Builders & Contractors*. The court also concluded that the individual plaintiffs did not have standing because they were not prequalified electrical contractors and had "neither bid on either project nor could have done so . . . ." Accordingly, the trial court granted the defen-

dants' motions to dismiss without reaching or deciding the alternative grounds advanced in support of their motions. Thereafter, the plaintiffs appealed to the Appellate Court from the trial court's judgment, and the appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

## II

## STANDARD OF REVIEW

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally pro-

tected interest . . . has been adversely affected." (Internal quotation marks omitted.) *May* v. *Coffey*, 291 Conn. 106, 112, 967 A.2d 495 (2009).

In the context of competitive bidding, it is well established that an unsuccessful bidder on a state or municipal contract has no contractual right under the common law that would afford standing to challenge the award of a contract. *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 178. "[A] bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted by the municipality, does not give rise to a contract between the parties. . . . An unsuccessful bidder, therefore, has no legal or equitable right in the contract. Not unlike any other person whose offer has been rejected, the disappointed bidder has no right to judicial intervention. . . .

"Moreover, no statute grants unsuccessful bidders standing to challenge the award of a state contract. . . . In particular, state and local competitive bidding laws have not been enacted in order to protect bidders. These laws serve to guard against abuses in the award of contracts such as favoritism, fraud or corruption and are enacted solely for the benefit of the public and in no sense create any rights in those who submit bids. . . .

"Despite these substantial constraints, we have recognized a limited exception to the rules of standing in order to provide a means of protecting the public's interest in properly implemented competitive bidding processes. . . . Under this exception, unsuccessful bidders have standing to challenge the award of a public contract where fraud, corruption or acts undermining the objective and integrity of the bidding process existed . . . . [S]uch a suit is brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting

essentially as a private attorney general." (Citations omitted; internal quotation marks omitted.) Id., 178–80.

"Our policy to limit standing so as to deny some claims brought by unsuccessful and precluded bidders is designed to protect twin goals that serve the public interest in various, sometimes conflicting, ways. The standing rules aim to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public." (Internal quotation marks omitted.) Id., 180.

Finally, because the issue of standing implicates subject matter jurisdiction, it may be a proper basis for granting a motion to dismiss. E.g., *May* v. *Coffey*, supra, 291 Conn. 113; see Practice Book § 10-31 (a) (1). "The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 200–201, 994 A.2d 106 (2010). "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper

party to invoke judicial resolution of the dispute."[12] (Internal quotation marks omitted.) *May* v. *Coffey,* supra, 113. Mindful of these principles, we address each of the plaintiffs' claims in turn.

## III

## ANALYSIS

## A

### Standing of ECI

ECI first claims that the trial court incorrectly concluded that it lacked standing to challenge the imposition of the PLA requirement and the rejection of its lowest, responsible, qualified bids for the school construction projects. ECI specifically claims that the trial court misapplied this court's narrow holding in *Associated Builders & Contractors* that the plaintiffs did not have standing because they had not bid on the project, as ECI had done in the present case. In addition, ECI claims that the court in *Associated Builders & Contractors* never considered the cost effects on the public bidding process of disqualifying nonunion contractors and workers, who constitute 90 percent of the local electrical workforce and 80 percent of the overall construction workforce, and never ruled on the discriminatory effects of the plaintiffs' challenge to the PLA requirement. ECI further claims that the trial court in the present case disregarded the extensive factual record before it, including "overwhelming evidence" that the effect of the PLA requirement was to exclude nonunion contractors and employees from working on the projects, and did not properly consider that ECI was the lowest, responsible qualified bidder. In this regard, ECI maintains that the complaint and accompanying affidavits set forth numerous ways in which the

---

[12] In the present case, additional facts also were entered into evidence. See part I of this opinion; see also footnote 17 of this opinion.

PLA requirement discriminated against ECI and other nonunion contractors and caused them to suffer specific, actionable harm by effectively barring them from working on the projects.

The nonstate defendants respond[13] that ECI's claim as to the validity of the PLA requirement is virtually identical to the claim that was unsuccessfully raised by the plaintiffs in *Associated Builders & Contractors* and that ECI's attempt to distinguish the present case from that and other Connecticut precedent is without merit. In particular, the nonstate defendants argue that *Associated Builders & Contractors* determined that cost is not a factor to be considered in deciding whether the competitive bidding laws are undermined. They further argue that neither ECI nor other nonunion contractors presented evidence that the PLA requirement prevented nonunion contractors from bidding or working on the projects by making it economically unfeasible for them to do so. The nonstate defendants thus contend that ECI has failed to prove that it has standing because it did not establish that the PLA requirement was used to perpetuate fraud, corruption, favoritism or conduct that undermines the objective and integrity of the competitive bidding process. We agree with ECI that the trial court incorrectly concluded that it did not have standing.

Because our analysis of this claim requires us to consider how the trial court interpreted and applied *Associated Builders & Contractors*, we divide the following discussion into three parts. In the first part, we review the reasoning in *Associated Builders & Contractors*. We next consider how the trial court applied *Associated Builders & Contractors* in the present case and explain why we disagree with the trial court's conclusions. We finally examine the sufficiency of the plain-

---

[13] The state defendants did not respond to this claim.

tiffs' allegations that the PLA requirement was used to perpetuate fraud, corruption, favoritism or other conduct that undermined the objective and integrity of the competitive bidding process.

1

*Associated Builders & Contractors*

We begin with the reasoning in *Associated Builders & Contractors.* The trial court's decision was based almost entirely on its interpretation of that case, in which this court concluded that the plaintiffs did not have standing. The plaintiffs were a trade association of contractors and subcontractors (association) and two individual subcontractors who sought to enjoin the defendant, the city of Hartford, from awarding a contract for the construction of a municipal parking garage. *Connecticut Associated Builders & Contractors* v. *Hartford,* supra, 251 Conn. 171. The association claimed that, but for a PLA requirement in the bid specifications, some of its contractor members would have submitted bids on the project. Id., 177. The defendant subsequently sought to dismiss the complaint on jurisdictional grounds, alleging that the plaintiffs lacked standing. Id., 174.

At the outset of its decision, the court described the principal issue as "whether nonbidding contractors and subcontractors[14] ha[d] standing to challenge a bid specification for a municipal project that require[d] the successful bidder to agree to abide by a [PLA]." Id., 170–71. It then determined that the nonbidding general contractors, who were represented by the association, did not have standing to file the complaint. Id., 185, 186. The court explained: "In order to have standing, a general contractor member would have had to establish a color-

---

[14] We note that one of the plaintiffs in *Associated Builders & Contractors* was ECI. See *Connecticut Associated Builders & Contractors* v. *Hartford,* supra, 251 Conn. 171.

able claim that: (1) either it bid on the project, or it would have submitted an equivalent bid, but for the [PLA] requirement; and (2) inclusion of the [PLA] requirement effectuated fraud, corruption, favoritism or other acts undermining the objective and integrity of the bidding process." Id., 186. The court stated that the plaintiffs had not established that the general contractor members of the association had met either part of the test because, "[w]ith respect to the first part, the association did not show that any of its general contractor members had bid on the project or would have bid on the project. . . . The association cannot, therefore, invoke the standing of its general contractor members as a basis for its own standing to pursue its challenge to the validity of the [PLA] requirement." Id. After concluding that the association had not satisfied this foundational, or threshold, element, the court determined that, "[e]ven if this foundational element had been met by testimony of the association's general contractor members that they would have bid, but for the [PLA] specification, the association still cannot prevail under the second part of the standing test." Id., 186–87.

With respect to the second part of the test, the association had claimed that the PLA requirement "arbitrarily and anticompetitively limit[ed] access to the bidding process" because it "imposed costs [on] nonunion general contracts that made it economically unfeasible for them to bid," and, therefore, it violated "the integrity of competitive bidding . . . [and] injur[ed] the general public by driving up the cost of government funded projects." Id., 187. The court disagreed, explaining that, "[e]ven assuming that the [PLA] requirement might increase the project's cost, we know of no requirement in the competitive bidding statutes that propels cost considerations to the top of the list of appropriate considerations for public contract specifications. If cost alone were the determinative factor of appropriate bid

criteria, disappointed bidders or nonbidders would have virtually unlimited opportunities to litigate project specifications on the ground of alternate designs, materials, safety requirements and so on. Such litigation would involve courts in comparative cost assessments that would severely impair the discretion of governmental bodies entrusted with the responsibility for governmental construction projects. It is neither unusual nor unfair for project specifications to give some potential bidders an economic advantage over others because of factors such as the bidder's expertise, specialization and reliability." Id., 187–88.

The court elaborated that the record failed to show that cost considerations had precluded nonunion general contractors from participating in the bidding process, stating in a footnote that "the plaintiffs ha[d] provided no explanation as to how the alleged increased expense to some potential bidders would raise the costs of the overall project. An increase in costs in one aspect of a project can equally well result in overall cost savings for the project. By avoiding labor disruption and maintaining a supply of skilled workers, as the project construction manager testified the [PLA] was designed to do, the [PLA] could reduce overall costs. The record . . . does not, in fact, support the association's claim that cost considerations precluded nonunion general contractors from participating in the bidding process. Two of the five bidders were nonunion contractors. The association presented no testimony to support its claim that government projects using [PLAs] had higher total costs than other similar projects without [a PLA]." Id., 187 n.12. The court thus concluded that the association had failed to make "a colorable factual showing" to support its claim of economic disadvantage. Id., 187. The court stated that the "the record . . . demonstrates a nondiscriminatory decision by the [defendant] to use a [PLA]"; id., 188; and that the "determinative

factor" in a bidding challenge was "whether the requirements in that process had been applied consistently and in good faith." Id., 189.

## 2
### Trial Court's Application of *Associated Builders & Contractors*

In relying on *Associated Builders & Contractors* when granting the defendants' motions to dismiss ECI's claim with respect to the competitive bidding statutes, the trial court initially acknowledged that none of the plaintiffs in that case had satisfied the threshold requirement of demonstrating that they had bid on the project or would have bid on the project but for the PLA requirement. The trial court then concluded that the court in *Associated Builders & Contractors* had reached the merits of the plaintiffs' claim by considering whether inclusion of the PLA requirement in the prebid specifications had " 'effectuated fraud, corruption, favoritism or other acts undermining the objective and integrity of the bidding process' " through the imposition of costs on nonunion contractors that made it economically unfeasible for them to bid. Referring to the statements in *Associated Builders & Contractors* that cost considerations were not " '[at] the top of the list of appropriate considerations for public contract specifications' " and that the defendant's decision to use a PLA was nondiscriminatory and within its discretion, the trial court determined that, because ECI had raised a "virtually identical" claim, the analysis of the claim on the merits in *Associated Builders & Contractors* was applicable and dispositive of the nonstate defendants' motions to dismiss in the present case.[15] We disagree with the trial

[15] The trial court concluded, on the basis of *Associated Builders & Contractors*, that (1) "a differential cost impact on union and nonunion contractors . . . affords the latter no basis for challenging [a PLA] requirement" and, therefore, "an unsuccessful bidder . . . lacks standing to complain of it . . . in a court of law," (2) "the ultimate issue to be decided on any proper bid challenge is whether the public authority gave fair and evenhanded

court's interpretation of *Associated Builders & Contractors* and the nonstate defendants' claim that the holding in that case is dispositive of their motions to dismiss.

As previously discussed, the principal issue in *Associated Builders & Contractors* was "whether *nonbidding* contractors and subcontractors ha[d] standing to challenge a bid specification for a municipal project that require[d] the successful bidder to agree to abide by a [PLA]." (Emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford,* supra, 251 Conn. 170–71. The court ultimately determined that the plaintiffs had not shown that any of the association's general contractor members had bid on the project or would have bid on the project under the first part of the test, and, therefore, it could not "invoke the standing of its general contractor members as a basis for its own standing to pursue its challenge to the validity of the [PLA] requirement." Id., 186. The court nonetheless proceeded to consider whether the plaintiffs could have prevailed under the second part of the test. See id., 186–87. It is that portion of the analysis on which the trial court in the present case relied to resolve the standing issue. Its reliance, however, was misplaced for the following reasons.

First, any consideration of the second part of the test in *Associated Builders & Contractors* was unnecessary

consideration to each bidder instead of treating different bidders differently," (3) the common-law principle denying standing to disappointed bidders remains intact unless abrogated by a statute that expressly confers standing, (4) Connecticut's competitive bidding statutes on their face do not identify overall project cost for special protection, (5) the prequalification statute, § 4a-100, which was enacted subsequent to *Associated Builders & Contractors,* does not "occup[y] the field" or preempt public officials from exercising their discretion and imposing other, or different, bid specifications, such as PLAs, as a precondition for the award of contracts on public works projects, and neither do any other related statutes; see General Statutes §§ 4b-91, 4b-92 and 10-287; and (6) there was no evidence that the use of PLAs for the projects in the present case was the result of fraud, corruption or favoritism.

following the court's dispositive holding that the association lacked standing under the first part of the test. Accordingly, the court's conclusion in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 186–87, that the plaintiffs could not prevail under the second part of the test and the reasoning on which its conclusion was based were nothing more than dicta.[16] See, e.g., *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 246, 558 A.2d 986 (1989) ("Once it becomes clear that the trial court lacked subject matter jurisdiction to hear the plaintiffs' complaint, any further discussion of the merits is pure dict[um]. . . . When the trial court concluded . . . that subject matter jurisdiction was missing, the remainder of its [ruling was] merely advisory . . . ." [Citation omitted; internal quotation marks omitted.]).

Second, we disagree with the trial court and the nonstate defendants that the court in *Associated Builders &*

---

[16] "[D]ictum is an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination . . . . Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case . . . are obiter dicta, and lack the force of an adjudication." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 738 n.79, 998 A.2d 1 (2010).

Justice Harper's assertion, in his concurrence and dissent, that the court's analysis under the second part of the test did not constitute dictum disregards our well established precedent and flies in the face of the court's own reasoning. The court made absolutely clear that it did not regard both parts of the test as threshold jurisdictional requirements when it referred to the first part of the test as its "foundational element"; *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 186; and further explained that, even if that part of the test had been satisfied, the association "still" could not prevail under the second part of the test. Id., 187. Moreover, to the extent Justice Harper cites twelve other cases as "weighty authority" for the proposition that the two parts of the test serve as independent grounds to support a judgment on standing, all but one are unpersuasive because they are from other jurisdictions, and the remaining Connecticut case lacks the dispositive language in *Associated Builders & Contractors* describing the first part of the test that was applied in that case as a threshold requirement.

*Contractors* considered the merits of the plaintiffs' complaint or ruled that the plaintiffs had failed to establish that the PLA requirement had a potentially discriminatory effect on nonunion contractors due to increased costs. Although the court's reference to whether the plaintiffs had produced sufficient evidence of fraud, corruption or favoritism may have suggested that it was considering the merits of the defendant's decision to impose a PLA requirement, the court itself rejected such a notion when it stated that "[t]he general rule of standing . . . is not inconsistent with the particular standard applicable to disappointed and would-be bidders: By requiring [the plaintiffs] to produce evidence that the bidding process was undermined by fraud, corruption or favoritism, the court is simply forcing the party challenging the competitive bidding process to make a *colorable* claim of injury that it is within the zone of interests protected by the competitive bidding laws . . . . *Although the plaintiffs were not required to prove the merits of their claim, they did have the lesser burden of establishing a colorable claim.*"[17]

---

[17] The trial court in the present case heard argument by counsel but took no testimony on all challenges the parties had claimed for a hearing on July 3, 2009. The parties also agreed that all documents and materials filed by either side could be considered parts of the evidentiary record on which to decide the issues presented on the pending motions. This included documentation the parties previously had filed in federal court, including their briefs, stipulations of fact and supporting and supplemental affidavits.

Although the parties raise no issues pertaining to the hearing in this case, we note that such a hearing is not typically required or held when the court is considering a motion to dismiss. As we explained in *Conboy* v. *State*, 292 Conn. 642, 974 A.2d 669 (2009), trial courts addressing motions to dismiss for lack of subject matter jurisdiction apply different rules and procedures depending on the state of the record at the time the motion is filed: "When a trial court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . .

"In contrast, if the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . other types of undisputed evidence . . . and/or public records of which judicial

(Emphasis altered; internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 181–82. Consistent with this view, the dissent in *Associated Builders & Contractors* observed multiple times that the majority had not reached the merits, stating that "[t]he court, in a hypertechnical ruling on standing, avoids a substantive issue that . . . we should review"; id., 193 (*Berdon, J.*, dissenting); "[t]he public interest should compel this court

notice may be taken . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiffs jurisdictional allegations . . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint . . . but may rest on the jurisdictional allegations therein. . . .

"Finally, [when] a jurisdictional determination is dependent on the resolution of a critical factual dispute, it cannot be decided on a motion to dismiss in the absence of an evidentiary hearing to establish jurisdictional facts. . . . Likewise, if the question of jurisdiction is intertwined with the merits of the case, a court cannot resolve the jurisdictional question without a hearing to evaluate those merits. . . . An evidentiary hearing is necessary because a court cannot make a critical factual [jurisdictional] finding based on memoranda and documents submitted by the parties." (Citations omitted; internal quotation marks omitted.) Id., 651–54.

To the extent this court stated in *Associated Builders & Contractors* that "the trial court was *required* to conduct an evidentiary hearing to decide whether the plaintiffs had established a colorable claim that the [PLA] requirement had undermined the integrity or objective of the competitive bidding process"; (emphasis added) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 182; or declared in the companion case of *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 740 A.2d 804 (1999), that "the evidentiary showing for standing . . . was [the association's] burden to make"; id., 214; we now clarify that, in most cases involving competitive bidding on public contracts, the allegations alone should provide a sufficient factual basis for deciding the jurisdictional issue of whether the plaintiff made a colorable claim of injury. Because the parties in the present case agreed, however, that the trial court could consider the materials and documents they had filed in federal court, all future references to the record in this case include that documentation as well as the facts alleged in the complaint.

to address this issue"; id. (*Berdon, J.*, dissenting); "[t]he majority avoids [the plaintiffs'] substantive claims by narrowly ruling that the plaintiffs have no standing"; id., 194 (*Berdon, J.*, dissenting); and that, "[b]y declining to afford the plaintiffs standing, the majority . . . simply ducks the issue of whether [PLA] requirements for a public construction contract violate state and local competitive bidding statutes." Id., 201 (*Berdon, J.*, dissenting). In addition, the court stated on several occasions that its conclusion that the association lacked standing was based on deficiencies in the record; see id., 187 n.12, 188, 189; and that the plaintiffs had failed to make "a colorable factual showing" in support of their claim. Id., 187. Thus, neither the majority nor the dissent in *Associated Builders & Contractors* believed that the plaintiffs' claim had been decided on its merits, and the trial court in the present case should not have applied the so-called holding in *Associated Builders & Contractors* under the second part of the test to decide the issues in the present case.

Third, to the extent the trial court and the nonstate defendants regard the court's discussion of cost in *Associated Builders & Contractors* as resolving the issue of whether a PLA requirement is discriminatory, and thus dispositive of the standing issue in the present case, they misconstrue the court's analysis and fail to consider the subsequent evolution of Connecticut's competitive bidding laws. *Associated Builders & Contractors* did not conclude that cost was not a factor to be considered in deciding whether the competitive bidding laws were undermined, nor did it evaluate or reach any conclusions regarding the broader question of whether the PLA requirement in that case contravened the competitive bidding laws. The court merely stated that it "[knew] of no requirement in the competitive bidding statutes that propels cost considerations to *the top of the list* of appropriate considerations for

public contract specifications" and that *"cost alone"* should not be "the determinative factor"; (emphasis added) id., 187–88; a statement with which ECI's attorney in the present case agreed during oral argument before this court. The court also noted that "[a]n increase in costs in one aspect of a project can equally well result in overall cost savings for the project. By avoiding labor disruption and maintaining a supply of skilled workers, as the project construction manager testified the [PLA] was designed to do, the requirement could reduce overall costs. The record . . . does not, in fact, support the association's claim that cost considerations precluded nonunion general contractors from participating in the bidding process." Id., 187 n.12. Accordingly, the court in *Associated Builders & Contractors* did not conclude, as the trial court concluded and the nonstate defendants claim, that a PLA requirement has no effect on competitive bidding because of increased costs to nonunion contractors and workers. It merely concluded that the "determinative factor" is whether the requirements of the bidding process have been applied consistently and in good faith, and that the plaintiffs had not made a "colorable factual showing" that the integrity of the bidding process had been affected by the additional costs allegedly imposed on nonunion contractors and workers by the PLA requirement. Id., 187–89.

Moreover, following the decision in *Associated Builders & Contractors*, the legislature enacted General Statutes § 4a-100, also known as the "prequalification statute," which requires all bidders on public construction projects to satisfy certain minimum standards in order to bid or perform work on such projects.[18] Thus,

[18] General Statutes § 4a-100 provides in relevant part: "(a) As used in this section: (1) 'Prequalification' means prequalification issued by the Commissioner of Administrative Services to bid on a contract or perform work pursuant to a contract for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or any other public work by the state or a municipality, except a public highway or bridge

given that the competitive bidding laws provide that a

project or any other construction project administered by the Department of Transportation, or to perform work under such a contract as a substantial subcontractor . . . .

\* \* \*

"(c) The application form shall, at a minimum, require the applicant to supply information concerning:

"(1) The applicant's form of organization;

"(2) The applicant's principals and key personnel and any names under which the applicant, principals or key personnel conducted business during the past five years;

"(3) Any legal or administrative proceedings pending or concluded adversely against the applicant or any of the applicant's principals or key personnel within the past five years which relate to the procurement or performance of any public or private construction contract and whether the applicant is aware of any investigation pending against the applicant or any principal or key personnel;

"(4) The nature of any financial, personal or familial relationship between the applicant and any public or private construction project owner listed on the application as constituting construction experience;

"(5) A statement of whether (A) the applicant has been disqualified pursuant to section 4b-95, this section or section 31-57c or 31-57d, (B) the applicant is on the list distributed by the Labor Commissioner pursuant to section 31-57a, (C) the applicant is disqualified or prohibited from being awarded a contract pursuant to section 31-57b, (D) the applicant has been disqualified by another state, (E) the applicant has been disqualified by a federal agency or pursuant to federal law, (F) the applicant's registration has been suspended or revoked by the Department of Consumer Protection pursuant to section 20-341gg, (G) the applicant has been disqualified by a municipality, and (H) the matters that gave rise to any such disqualification, suspension or revocation have been eliminated or remedied; and

"(6) Other information as the commissioner deems relevant to the determination of the applicant's qualifications and responsibilities.

"(d) The applicant shall include a statement of financial condition prepared by a certified public accountant which includes information concerning the applicant's assets and liabilities, plant and equipment, bank and credit references, bonding company and maximum bonding capacity, and other information as the commissioner deems relevant to an evaluation of the applicant's financial capacity and responsibility.

"(e) Information contained in the application shall be current as of the time of filing except that the statement of financial condition shall pertain to the applicant's most recently-completed fiscal year.

"(f) The commissioner shall determine whether to prequalify an applicant on the basis of the application and on relevant past performance according to procedures and criteria set forth in regulations which the commissioner shall adopt on or before October 1, 2005, in accordance with chapter 54.

contract shall be awarded to the "lowest responsible

Such criteria shall include, at a minimum, the record of the applicant's performance, including, but not limited to, written evaluations of the applicant's performance on public or private projects, the applicant's past experience on projects of various size and type, the skill, ability and integrity of the applicant and any subcontractors used by the applicant, the experience and qualifications of supervisory personnel employed by the applicant, the maximum amount of work the applicant is capable of undertaking as demonstrated by the applicant's financial condition, bonding capacity, size of past projects and present and anticipated work commitments, and any other relevant criteria that the commissioner prescribes. Such regulations shall also (1) provide that the criteria considered shall be assigned separate designated numerical values and weights and that the applicant shall be assigned an overall numerical rating on the basis of all criteria, and (2) establish prequalification classifications, aggregate work capacity ratings and single project limits. Such prequalification classifications shall be used to establish the types of work a contractor or substantial subcontractor is qualified to perform and the aggregate work capacity ratings shall be used to establish the maximum amount of work a contractor or substantial subcontractor is capable of undertaking.

"(g) (1) The applicant shall indicate the prequalification classifications, aggregate work capacity ratings and single project limits that are sought. The commissioner may issue a certificate of prequalification to any applicant who meets the requirements of this section. Such certificate shall be effective for one year from the date issued and shall indicate the contractor's or substantial subcontractor's prequalification classifications, aggregate work capacity ratings and single project limits. . . .

\* \* \*

"(i) The commissioner may not issue or renew a prequalification certificate to any contractor or substantial subcontractor (1) who is disqualified pursuant to section 31-57c or 31-57d, or (2) who has a principal or key personnel who, within the past five years, has a conviction or has entered a plea of guilty or nolo contendere for or has admitted to commission of an act or omission that reasonably could have resulted in disqualification pursuant to any provision of subdivisions (1) to (3), inclusive, of subsection (d) of section 31-57c or subdivisions (1) to (3), inclusive, of subsection (d) of section 31-57d, as determined by the commissioner.

"(j) The commissioner may revoke a contractor's or substantial subcontractor's prequalification or reduce the contractor's or substantial subcontractor's prequalification classification or aggregate work capacity ratings, after an opportunity for a hearing, if the commissioner receives additional information that supports such revocation or reduction. During the course of such hearing process, the commissioner may suspend a contractor's or substantial subcontractor's prequalification certificate if the commissioner determines that there is probable cause to believe that such contractor or substantial subcontractor engaged in conduct that significantly undermines

qualified bidder"; General Statutes § 10-287 (b) (1); the prequalification statute ensures that bidders are both responsible and qualified, and cost necessarily rises to

the skill, ability or integrity of such contractor or substantial subcontractor. Any such suspension shall not exceed a period of three months and shall be accompanied by a written decision of the commissioner that sets forth the reasons for and duration of such suspension. The commissioner shall send notification of any such suspension to such contractor or substantial subcontractor by certified mail, return receipt requested. Such contractor or substantial subcontractor may file a response, in writing, not later than thirty days after receipt of such notice. The commissioner shall review any such response submitted by a contractor or substantial subcontractor within such thirty-day period.

"(k) (1) Any substantial evidence of fraud in obtaining or maintaining prequalification or any materially false statement in the application, update statement or update bid statement may, in the discretion of the awarding authority, result in termination of any contract awarded the contractor by the awarding authority. . . .

"(2) The commissioner shall deny or revoke the prequalification of any contractor or substantial subcontractor if the commissioner finds that the contractor or substantial subcontractor, or a principal or key personnel of such contractor or substantial contractor, within the past five years (A) has included any materially false statement in a prequalification application, update statement or update bid statement, (B) has been convicted of, entered a plea of guilty or nolo contendere for, or admitted to, a crime related to the procurement or performance of any public or private construction contract, or (C) has otherwise engaged in fraud in obtaining or maintaining prequalification. Any revocation made pursuant to this subsection shall be made only after an opportunity for a hearing. Any contractor or substantial subcontractor whose prequalification has been revoked pursuant to this subsection shall be disqualified for a period of two years after which the contractor or substantial subcontractor may reapply for prequalification, except that a contractor or substantial subcontractor whose prequalification has been revoked on the basis of conviction of a crime or engaging in fraud shall be disqualified for a period of five years after which the contractor or substantial subcontractor may reapply for prequalification. The commissioner shall not prequalify a contractor or substantial subcontractor whose prequalification has been revoked pursuant to this subdivision until the expiration of said two-year, five-year, or other applicable disqualification period and the commissioner is satisfied that the matters that gave rise to the revocation have been eliminated or remedied.

"(l) The commissioner shall provide written notice of any revocation, disqualification, reduction in classification or capacity rating or reinstated prequalification to the Commissioner of Public Works, the Commissioner of Consumer Protection and the President of The University of Connecticut not later than thirty days after any final determination. . . ."

the "top of the list"[19] of appropriate considerations for public contract specifications.[20] *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187.

Finally, the statement in *Associated Builders & Contractors* that "[t]he trial court's determination that the

[19] We nonetheless agree with *Associated Builders & Contractors* that "cost alone" may not always be "the determinative factor" in awarding a public construction contract. *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187–88.

[20] Justice Harper asserts that "[t]he majority's approach to cost appears to conflate two distinct levels of cost consideration," specifically, project costs associated with items such as the building's location and size, construction materials, remediation activities and time to completion, and the cost of the project as determined by the winning bid in the competitive bidding process. Footnote 4 of the concurring and dissenting opinion. Thus, Justice Harper essentially contends that, because the PLA requirement is a bid specification, it cannot be challenged under the competitive bidding statutes or Connecticut precedent as effectuating fraud, corruption, favoritism or acts undermining the objective or integrity of the bidding process. See id. Justice Harper, however, ignores our holding in *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 694–95, 600 A.2d 1019 (1991), that "a plaintiff who ha[s] not submitted a proposal on a public project ha[s] standing to challenge a *specification contained in the bid documents* if that specification preclude[s] the plaintiff's participation in a manner that impair[s] the fairness of the bidding process." (Emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 180. Likewise, Justice Harper ignores the fact that *Associated Builders & Contractors*, which cited *Unisys Corp.* with approval; see id.; did not reject the association's claim because it was an improper challenge to the bidding specifications but because the association had failed to make a "colorable factual showing," through allegations or other evidence, that "limiting the number of potential bidders violates not only the integrity of competitive bidding but also injures the general public by driving up the cost of government funded projects." Id., 187. To the extent Justice Harper suggests otherwise, we emphasize that *Associated Builders & Contractors* did not preclude any future claim that a bid specification with substantial cost effects on a large group of potential bidders violates the competitive bidding statutes, which were enacted for the public benefit "to secure the best product at the lowest price"; *Spiniello Construction Co.* v. *Manchester*, 189 Conn. 539, 543, 456 A.2d 1199 (1983); and the decision in *Associated Builders & Contractors* is not dispositive of ECI's claim that the PLA bid specification affects the fairness and integrity of the bidding process by imposing additional costs solely on bidders who are not union members.

decision to adhere to a [PLA] was within the defendant's discretion and the bounds of the competitive bidding statutes [and], therefore, did not exceed the limits of our case law"; id., 182; did not mean that a PLA requirement may never affect the integrity of the competitive bidding process. The court made the foregoing comment in response to the plaintiffs' claim that the trial court improperly had reached the merits of whether the defendant's decision to use a PLA was a proper exercise of its discretion. See id., 181–82. In that context, the court merely was observing that the defendant's decision to use a PLA was discretionary and that the trial court had consulted our case law and properly determined that, in order to challenge the PLA requirement, the plaintiffs were required to make a colorable claim of injury by producing evidence that the bidding process had been undermined by fraud, favoritism or corruption.[21] See id., 182. The court made a similar

[21] The court stated, with respect to this issue: "The plaintiffs argue that the trial court's analysis of standing was improper because it reached the merits of the plaintiffs' claims in evaluating whether the [defendant's] decision to use a [PLA] was a proper exercise of its discretion. We disagree.

"The plaintiffs observe . . . that standing concerns . . . the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question and does not involve an inquiry into the merits of the claim. According to the plaintiffs, whether adoption of the [PLA] requirement was within the [defendant's] discretion was a question separate and apart from the question of their standing to challenge the [defendant's] action.

"The general rule of standing cited by the plaintiffs is not contested. As the trial court noted, however, that rule is not inconsistent with the particular standard applicable to disappointed and would-be bidders: By requiring [the association] to produce evidence that the bidding process was undermined by fraud, corruption or favoritism, the court is simply forcing the party challenging the competitive bidding process to make a colorable claim of injury that it is within the zone of interests protected by the competitive bidding laws . . . . Although the plaintiffs were not required to prove the merits of their claim, they did have the lesser burden of establishing a *colorable* claim. See *Maloney* v. *Pac*, [183 Conn. 313, 321, 439 A.2d 349 (1981)]. . . . The trial court's determination that the decision to adhere to a [PLA] was within the [defendant's] discretion and the bounds of the

observation in *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 213–14, 740 A.2d 804 (1999),[22] a companion case released on the same day as *Associated Builders & Contractors*. In other words, the court in both *Associated Builders & Contractors* and *Anson* was referring to the fact that a public

competitive bidding statutes, therefore, did not exceed the limits of our case law." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 181–82.

[22] In *Anson*, the court summarized the trial court's reasoning in granting the defendant's motion to dismiss the plaintiffs' claim that the PLA requirement in the bid specifications infringed on the plaintiffs' rights of free speech and association as follows: "The [trial] court . . . stated that inclusion of a [PLA] requirement in the project specifications was justified by the legitimate public interest in completion of a public works project within time and financial constraints. The nonstrike clause contained in [PLAs] would further that interest. The [defendant's] decision to use a [PLA] was not based on any improper motive. The court determined that [t]he state has a legitimate interest in completing a public works project within time and financial constraints. Evidence showed that the commissioner decided to use the [PLA] on this project based on knowledge of the use of [PLAs] by other public entities. *The plaintiffs did not present any evidence* that the [PLA] was a means to exclude nonunion contractors or amounted to such an exclusion. The purpose of the competitive bidding statutes is not to aid the contractors by making it economically feasible for all to bid . . . but to promote the public interest in the efficient completion of public works projects. . . . The state's interest in its own finances when undertaking public works projects takes precedence over the finances or business methods of individual contractors. . . . The [defendant's] decision to try a [PLA] on this project was a legitimate exercise of his discretion to find a way to achieve the state's goal while remaining within the bounds of the competitive bidding statutes. . . .

"It is impossible to reconcile these findings with any conclusion other than that *the association failed to establish that the use of a [PLA], under the circumstances of [the] case*, constituted an infringement of the constitutional rights of its members. The constitution is not violated simply because a public agency adopts a legitimate public policy that runs counter to the philosophical views or business practices espoused by the membership of the association. *The association did not make the evidentiary showing for standing that was its burden to make.*" (Emphasis added; internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Anson*, supra, 251 Conn. 213–14. We reiterate that the court's reference to an evidentiary showing must be understood in light of our analysis in *Conboy*. See footnote 17 of this opinion.

agency's discretion to require a PLA in any given circumstance is not unfettered. A balance must be struck between the potentially desirable effects of a PLA, such as the completion of a public project within time and financial constraints, and the public's interest in the fairness and economy associated with the competitive bidding process. Viewed through this lens, the court in *Associated Builders & Contractors* was attempting to determine whether the plaintiffs' allegations and other evidence in the record were sufficient to support a colorable claim that the integrity of the competitive bidding process would be seriously undermined by the imposition of the PLA requirement. See *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187–89 and n.12; see also footnote 17 of this opinion. Similarly, the court in *Anson* was attempting to determine whether the allegations and other evidence in the record concerning deprivation of the plaintiffs' rights of free speech and association were sufficient to support a colorable claim that the integrity of the competitive bidding process would be seriously undermined by the imposition of the PLA requirement. See *Connecticut Associated Builders & Contractors* v. *Anson*, supra, 251 Conn. 213–14. In neither case was the court considering the claims on their merits. Consequently, for all of the foregoing reasons, we conclude that, to the extent the trial court in the present case treated the analysis of the PLA requirement in *Associated Builders & Contractors* under the second part of the standing test as a decision on the merits, it misunderstood and misapplied that decision.

3

Sufficiency of the Allegations

We also agree with ECI that the trial court failed to conduct an in-depth examination of the plaintiffs' allegations to determine whether they were sufficient

to support a colorable claim of injury. See footnote 23 of this opinion. As previously noted, "[w]hen a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *Gold* v. *Rowland*, supra, 296 Conn. 200–201. The record includes "supporting affidavits that contain undisputed facts." (Internal quotation marks omitted.) *May* v. *Coffey*, supra, 291 Conn. 108. In the present case, we conclude, upon an examination of the allegations in the underlying complaint,[23] together with the affidavits and

---

[23] ECI alleged, inter alia, that (1) it was a nonunion electrical contractor with extensive experience in public construction projects, (2) bid packages for the two school construction projects were put out for competitive bidding by the city pursuant to the competitive bidding laws for the purpose of determining the lowest, responsible, qualified bidder and entering into a contract for the required work with the successful bidder, (3) ECI's bid was the lowest, responsible, qualified bid for each project, (4) the state is providing 90 percent of the funding for both projects, (5) state law provides that "[a]ll orders and contracts for school building construction receiving state assistance . . . shall be awarded to the lowest responsible qualified bidder . . . after a public invitation to bid"; General Statutes § 10-287 (b) (1); and that "the words 'lowest responsible and qualified bidder' shall mean the bidder who is prequalified pursuant to section 4a-100, and whose bid is the lowest of those bidders possessing the skill, ability and integrity necessary to faithful performance of the work based on objective criteria considering past performance and information"; General Statutes § 4b-92; (6) ECI is prequalified under the applicable statutory provisions to bid and perform the work on both projects, (7) ECI fully meets the statutory definition of "lowest responsible and qualified bidder," (8) none of the statutory requirements that define lowest responsible qualified bidder and none of the other public bidding statutes suggest that a bidder must execute a PLA and must agree to draw all of its field labor through referrals from a designated trade union, or that its nonunion employees must first join a designated trade union as a prerequisite to execution of a contract and performance

stipulations of fact provided in support thereof, that ECI

of the subject work, (9) based on the foregoing statutory requirements and regulations adopted thereto, it was illegal and beyond the city's authority to impose as a mandatory condition for the award of the two bid packages that the successful bidder execute a PLA and agree to draw all of its field labor through referrals from a designated trade union, or that its nonunion employees must first join a designated trade union before execution of a contract and performance of the subject work could commence, (10) the city stated in the bid documents for both projects that all bidders would have to comply with a PLA requiring the successful bidder, among other things, to draw all of its field labor through referrals from a designated trade union, or that its nonunion employees must first join a designated trade union as a prerequisite to execution of a contract and performance of the subject work, (11) there is no provision in the PLAs that an employee of ECI who wants to join the designated trade union solely for the purpose of working on the project would be granted membership, would be assigned to work on the project by the designated trade union at the request of the ECI employee, would be allowed to work on other non-PLA projects while a member of the union for the purpose of working on the project, would have any right to be reimbursed or enjoy the benefit of contributions made on his behalf to the union pension funds or to withhold funds or to be reimbursed for contributions designated for the union's political or social activities with which the employee disagreed, (12) ECI, as a nonunion contractor, would incur significant and duplicative costs, as described in detail in the complaint, for providing the labor necessary to construct the projects under the required PLAs, which would severely impair ECI's ability successfully to perform the work on the projects and would place ECI at a severe competitive disadvantage relative to the union contractors bidding for the work, (13) in light of these issues, ECI requested a waiver of the PLA requirement for purposes of the subject bid on the electrical work for the projects but received no response, (14) ECI thereafter submitted its lowest responsible qualified bid with a second request for a waiver of the PLA requirement and a statement that it would not perform the work pursuant to the PLA requirement in the bid documents, (15) ECI subsequently was informed at a meeting with city officials and representatives that they intended to reject ECI's bids on the basis of ECI's refusal to agree to the PLA requirement, (16) ECI received no further written communication from the city in this regard, (17) on the basis of all information available to ECI, its bids for the projects were rejected due to its refusal to agree to the mandatory PLA requirement, and the contract for electrical work was awarded to and a contract executed with a union contractor that was the third lowest bidder, (18) the city's actions and stated intent to bar any contractor from projects if it does not agree to a PLA constitute blatant favoritism for union contractors and union workers, which provides union contractors and construction trade unions with an unfair and illegal competitive advantage over nonunion contractors and nonunion construction work-

made the colorable factual showing that was missing in *Associated Builders & Contractors*. See footnote 17 of this opinion.

It is undisputed that ECI submitted a bid on both construction projects, thus satisfying the first part of the standing test. ECI also sustained its burden under the second part of the test because the complaint, the supporting affidavits and other evidence, considered in their most favorable light, contained detailed allegations as to the discriminatory effect of the PLA requirement on ECI and other nonunion contractors.

Specifically, paragraph thirty-seven of the complaint alleges twelve ways in which the PLA requirement would "severely impair" ECI's ability as a nonunion contractor to successfully perform work on the projects and place ECI at a competitive disadvantage relative to union contractors bidding on the same projects. Similarly, in his affidavit dated March 25, 2009, William J. Flynn, Jr., ECI's vice president for nearly fifteen years, describes how the PLA requirement would penalize ECI, or any other nonunion contractor, their field

ers, (19) as demonstrated by ECI's significantly lower bid, as well as by other objective data, the imposition of PLAs in the context of public school construction diminishes competition and increases the cost of construction by 10 to 20 percent, (20) nonunion construction contractors and workers comprise over 80 percent of the construction industry in Connecticut, and the imposition of PLAs severely discourages and often eliminates their bidding on those contracts, thus decreasing competition, (21) the imposition of mandatory PLAs undermines the objective and integrity of the public competitive bidding process and exhibits patent favoritism to the trade unions and union contractors, to the unfair and severe disadvantage of nonunion contractors such as ECI and its nonunion employees in this action, and (22) ECI would have been the successful bidder on both projects if it had not been for the mandatory PLA requirement, and because a significant amount of ECI's work is in public construction in Connecticut, the PLA requirement will severely and irreparably harm ECI's ongoing business operations as well as the employment opportunities of its individual employees, and will harm ECI's reputation and future ability to obtain work by causing future employers to raise questions about ECI's inability to obtain past work involving PLA requirements.

employees and taxpayers by significantly increasing labor costs and how the alleged harm would be ongoing. Finally, in their joint affidavit dated March 23, 2009, which draws on four studies conducted by the Beacon Hill Institute at Suffolk University in Boston, Massachusetts, concerning PLAs and the cost of public school construction in Connecticut, Massachusetts and New York, David G. Tuerck[24] and Paul Bachman[25] apply the studies' findings to the PLA requirement in the present case and describe how it would drive up project construction costs by limiting competition and imposing costly work and hiring rules on nonunion contractors. In their affidavit, Tuerck and Bachman also describe how the area labor market analysis for the Hartford public school system, produced by the Fluor Corporation in March, 2003, for the purpose of recommending the most appropriate labor posture for the public works projects under consideration, recommended the use of PLAs without any analysis of cost, schedule, or quality impacts from imposing a mandatory PLA in Hartford and without any evidence that actual union disruptions of previous school construction projects had led to delays or increased costs in Connecticut such that PLAs were necessary to foster school construction in a more economical and efficient manner.[26] Accordingly, we conclude that ECI's allegations, as supplemented by the supporting affidavits and evidence in the record that the PLA requirement would have a discriminatory effect on ECI and other nonunion contractors, were sufficient

[24] Tuerck is a professor of economics, chairman of the economics department and executive director of the Beacon Hill Institute.

[25] Bachman is the director of research at the Beacon Hill Institute.

[26] In their joint supplemental affidavit dated April 27, 2009, Tuerck and Bachman address the "Kotler paper"; see F. Kotler, School of Industrial and Labor Relations, Cornell University, "Project Labor Agreements in New York State: In the Public Interest" (March, 2009); which was attached as an exhibit to the city's reply brief on its motion to dismiss, and point out what they regard as significant errors in Fred B. Kotler's critique of the methodology used in the Beacon Hill Institute studies.

to satisfy the second part of the standing test, which requires a colorable claim that fraud, corruption, favoritism or other conduct has seriously undermined the objective and integrity of the competitive bidding process.

Insofar as the nonstate defendants insist that ECI provided insufficient evidence to establish that it has standing, we disagree. One need only examine the reasons why the court in *Associated Builders & Contractors* concluded that the association did *not* have standing to understand why ECI in the present case does. In *Associated Builders & Contractors*, this court explained that the association had failed to make a colorable factual showing under the second part of the standing test because it had "provided no explanation as to how the alleged increased expense to some potential bidders would raise the costs of the overall project," the record did not "support the association's claim that cost considerations [had] precluded nonunion general contractors from participating in the bidding process," and "[t]he association [had] presented no testimony . . . that government projects using [PLAs] had higher total costs than other similar projects without such a requirement." *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187 n.12. In other words, the complaint in *Associated Builders & Contractors* alleged a violation of the competitive bidding laws in the most general, conclusory terms, without any allegations as to the specific effects of the PLA requirement on the association and other nonunion contractors.[27] In the present case, the lengthy allegations

---

[27] The plaintiffs claimed in count one of their complaint, in which they alleged a violation of the competitive bidding statutes, that the PLA requirement imposed conditions that they would not otherwise have included in their bids unrelated to a bidder's status as the lowest qualified bidder and that the PLA requirement was arbitrary and capricious and in violation of the competitive bidding statutes because the city (1) did not consider or analyze any data as to the effect of PLAs on the projects, including cost, timeliness or efficiency, (2) did not consider or analyze the effect of PLAs

in the complaint and the supporting affidavits of Flynn, Tuerck and Bachman provided such information. Accordingly, we conclude that ECI made a colorable claim of injury[28] and that the trial court has subject matter jurisdiction in this matter.[29]

on competition for work on the projects, on nonunion workers and their right not to become members of a union, on nonunion workers' health insurance coverage and pension benefits, on safety, and on public policy objectives relating to employment opportunities for minorities, women and the economically disadvantaged, and (3) had no reason to believe the projects would be subject to delays because of strikes or labor unrest or that PLAs would ensure more timely completion of the projects or would relate in any way to the provisions or purposes of the competitive bidding requirements. The plaintiffs also alleged in count one that the city, by requiring bidders to agree to the terms of a PLA, was exceeding the scope of its authority under the applicable bidding statutes, favored union over nonunion contractors and subcontractors and, by failing to inform bidders of the terms of the PLA, had made it impossible for a bidder to prepare a responsive bid. The plaintiffs thus alleged that the foregoing conduct caused them irreparable harm as potential bidders, interested parties, citizens and taxpayers.

[28] We do not consider ECI's claim that the trial court failed to discuss the criteria that a court should employ in determining the validity of a PLA bid specification for a publicly funded construction project because that claim would involve consideration of the merits, rather than the issue of the plaintiffs' standing. For the same reason, we do not consider the plaintiffs' claim that the trial court improperly concluded that the PLA requirement imposed by the city for the school construction projects did not violate the provisions of the applicable competitive bidding laws.

[29] Justice Harper contends that the majority expands the court's subject matter jurisdiction by "depart[ing] from the narrowly circumscribed doctrine of standing established by our past cases dealing with [the competitive bidding] statutes," particularly this court's holding in *Associated Builders & Contractors*, and "disregards . . . the lawmaking authority of the legislature." Citing *Spiniello Construction Co.* v. *Manchester*, supra, 189 Conn. 545, *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 499, 505, 467 A.2d 674 (1983), and *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 696, Justice Harper specifically contends that the second part of the standing test, namely, that "the alleged illegalities amounted to fraud, corruption, favoritism or acts undermining the objective and integrity of the competitive bidding process"; *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 181; is satisfied only when a plaintiff makes "a colorable claim that the bidding process—from the development of project specifications and bidding rules to the application of these to bidders—was tainted by procedural impropriety." We disagree. Although it is true that

B

## Standing of the Individual Plaintiffs

The six individual plaintiffs claim that the trial court incorrectly concluded that they do not have standing to challenge the imposition of the mandatory PLAs for the school construction projects under article first,

the alleged violations in *Spiniello* and *Ardmare*, respectively, involved irregular bids because of an oral rule addendum communicated to only one bidder and an improper signature on a bidding form, both of which flaws may be characterized as strictly *procedural* in nature; see *Ardmare Construction Co.* v. *Freedman*, supra, 499–500; *Spiniello Construction Co.* v. *Manchester*, supra, 544–45; the alleged violation in *Unisys Corp.* was that the single source bid specifications *favored a particular vendor. Unisys Corp.* v. *Dept. of Labor*, supra, 691. Although the plaintiff in *Unisys Corp.* also alleged favoritism on the ground that the bid specifications had been prepared with the assistance of the vendor in question; see id.; the court ultimately held that the plaintiff would have standing if it could show that the restrictions imposed by the single source specifications alone precluded it from participating in a manner that impaired the fairness of the bidding process; see id., 695; see also *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 180; and that the plaintiff was entitled to an evidentiary hearing to determine whether the specifications had caused such an impairment. *Unisys Corp.* v. *Dept. of Labor*, supra, 695, 698. The court did not qualify its holding by adding that the plaintiff also would be required to show that the drafting of the specifications had been tainted by procedural impropriety. Thereafter, the court in *Associated Builders & Contractors* determined under the second part of the standing test that the plaintiffs in that case had "failed to make even a colorable factual showing" in support of their claim that the use of a PLA illegally had resulted in the absence of a level playing field for union and nonunion contractors and subcontractors interested in participating in a government building project. *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187. The court did *not* conclude, as Justice Harper suggests, that the inclusion of a PLA bid specification *never* can be challenged on the ground that it favors union over nonunion bidders unless accompanied by a drafting impropriety, but only that the plaintiffs had failed to assert a colorable claim of injury in that case, which accounts for the court's repeated references to deficiencies in the record as the reason for its decision. Id., 187 n.12, 188–89. Accordingly, *Associated Builders & Contractors* cannot dictate the result here, as Justice Harper contends, because the record in the present case, unlike the record in *Associated Builders & Contractors*, is sufficient to support the conclusion that ECI had standing.

§§ 4[30] and 5,[31] of the Connecticut constitution, which guarantee freedom of speech and association, and article first, §§ 1[32] and 20,[33] of the Connecticut constitution, which guarantee equal protection under the law. They specifically claim that the PLA requirement violates their rights to freedom of speech and association because it mandates that they join a union in order to work on the projects and requires them to make payments to the union that will be used to further social and political goals that they may not support and that are unrelated to collective bargaining. They also claim that the PLA requirement violates their equal protection rights because it would severely restrict, or effectively bar, nonunion contractors such as ECI and nonunion licensed journeymen and apprentices like themselves from working on the projects, thus conferring illegal benefits, advantages and privileges on union contractors and union journeymen and apprentices. The nonstate defendants respond that the trial court properly concluded that the individual plaintiffs do not have standing to pursue their state constitutional claims because they are not prequalified electrical contractors,

[30] Article first, § 4, of the Connecticut constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[31] Article first, § 5, of the Connecticut constitution provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

[32] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[33] Article first, § 20, of the Connecticut constitution provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

Although article first, § 20, of the Connecticut constitution has been amended by articles five and twenty-one of the amendments to the Connecticut constitution, the classes of persons to which protection was extended under these amendments are not relevant for purposes of the individual plaintiffs' claims in this case.

and, therefore, they did not, and could not have, bid on the projects.[34] We agree with the nonstate defendants that the trial court properly concluded that the individual plaintiffs lacked standing.[35]

A similar issue was raised in *Connecticut Associated Builders & Contractors* v. *Anson*, supra, 251 Conn. 204. In that case, the plaintiffs included two subcontractors and one of their employees, who was suing in his capacity as an individual and a taxpayer. Id., 204 and n.1. The trial court concluded that the individual plaintiff lacked standing to challenge the bidding process on the ground that it impaired his federal and state constitutional rights to freedom of speech and association. See id., 205–206. This court agreed, stating that the individual plaintiff and the plaintiff subcontractors had "no standing to pursue a challenge to general bid specifications because, in their own capacity, they never can bid directly for government projects. Their preclusion from the bidding process has no relationship to whether they operate union shops, or whether they are opposed philosophically to union shops. Their preclusion stems from the nondiscriminatory and uncontested industry practice of limiting bidding to general contractors. If general contractors were indeed to incur higher costs because of [PLA] contract specifications . . . the possible economic consequences of increased costs attributable to potential subcontractors [and individual employees] are too speculative and too attenuated to constitute 'some direct injury' for the purposes of conferring standing on such subcontractors [and individual

[34] The state defendants did not respond to this claim.

[35] In their complaint, the individual plaintiffs made similar claims under the federal constitution. The District Court concluded that they had standing to bring those claims on the basis of its determination that the plaintiffs had made a prima facie showing that jurisdiction existed by way of their pleadings and affidavits but dismissed the claims on their merits. We adopt a different view as to the individual plaintiffs' standing to bring their state constitutional claims for the reasons discussed hereinafter.

employees]. See *Maloney* v. *Pac*, 183 Conn. 313, 320–21, 439 A.2d 349 (1981)." *Connecticut Associated Builders & Contractors* v. *Anson*, supra, 208–209; see also id., 208 n.8.

In the present case, we agree with the trial court that the six individual plaintiffs have not suffered the direct or actual injury required under Connecticut law to establish standing because they are not prequalified electrical contractors, and, accordingly, they did not bid, nor could they have bid, on the school construction projects. Moreover, due to the fact that ECI was not the winning bidder, the individual plaintiffs never were compelled to make payments to the union or directly barred from working on the projects. We therefore conclude that they lacked standing to bring their state constitutional claims because the claims were too remote and speculative.

The individual plaintiffs rely on *Abood* v. *Detroit Board of Education*, 431 U.S. 209, 212–13, 236–37, 97 S. Ct. 1782, 52 L. Ed. 2d 261 (1977), in which the United States Supreme Court held that the general allegations in a complaint filed by a group of teachers who were unwilling to join a union, refused to pay dues and opposed collective bargaining in the public sector were, "if proved," sufficient to establish a cause of action under the first and fourteenth amendments to the United States constitution. *Abood* is distinguishable from the present case, however, because the teachers were compelled to pay, as a condition of their employment, a service fee equal in amount to union dues even if the teacher was not a union member, and any teacher who failed to meet that obligation was subject to discharge. Id., 212. In the present case, the individual plaintiffs were not required to comply with a condition of employment they opposed, such as payments to the union, nor were they subject to consequences for not joining a union, such as being barred from working on

the projects, because ECI was not the winning bidder, and, thus, they had no opportunity to work on the projects. Consequently, unlike the teachers in *Abood*, the individual plaintiffs in the present case were only indirectly affected by the city's rejection of ECI's low bid, and they did not have standing to bring their claims.

## C

## Antitrust Claims

ECI's final claim is that the trial court incorrectly concluded that it did not have standing to prosecute its claim against the city for violation of the Connecticut Antitrust Act. It specifically contends that the PLA requirement in this case violates General Statutes §§ 35-26,[36] 35-28[37] and 35-29[38] because, inter alia, it (1) bars ECI and other nonunion contractors and subcontractors from executing contracts and performing work on the projects without signing the PLA and abiding by its restrictive terms, and (2) resulted in the city's refusal

[36] General Statutes § 35-26 provides: "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful."

[37] General Statutes § 35-28 provides: "Without limiting section 35-26, every contract, combination, or conspiracy is unlawful when the same are for the purpose, or have the effect, of: (a) Fixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce; (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce; or (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person."

[38] General Statutes § 35-29 provides: "Every lease, sale or contract for the furnishing of services or for the sale of commodities, or for the fixing of prices charged therefor, or for the giving or selling of a discount or rebate therefrom, on the condition or understanding that the lessee or purchaser shall not deal in the services or the commodities of a competitor or competitors of the lessor or seller, shall be unlawful where the effect of such lease or sale or contract for sale or such condition or understanding may be to substantially lessen competition or tend to create a monopoly in any part of trade or commerce and where such goods or services are for the use, consumption or resale in this state."

to award and execute the subject contracts with ECI, the lowest responsible qualified bidder, due to ECI's refusal to execute and abide by the PLA requirement. The nonstate defendants respond that ECI did not have standing to pursue its antitrust claim because it was inadequately briefed, and, even if it was adequately briefed, ECI failed to establish proof of a public injury to competition.[39] The trial court did not directly address ECI's antitrust claim but concluded more generally that the plaintiffs lacked standing to prosecute their "pending claims . . . ." We conclude that ECI had standing to bring its antitrust claim.

We first consider the nonstate defendants' contention that ECI's antitrust claim was inadequately briefed. It is well established that "[w]e are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Citations omitted; internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).

In its brief, ECI addresses the standard of review, the statutory provisions allegedly violated, the portions of the complaint containing the antitrust allegations, the manner in which the antitrust statutes were violated and the relevant legal precedent. Accordingly, we conclude that the claim was adequately briefed.[40]

---

[39] The state defendants did not respond to this claim.

[40] We reject Justice Harper's contention to the contrary. Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. See, e.g., *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010). Claims are also inadequately briefed when they are raised for the first time in a reply brief; e.g., id.; or consist of "conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." *Connecticut Coalition Against Millstone*

We next consider whether ECI has standing to bring its antitrust claim. In *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 270 Conn. 619, 622–23, 854 A.2d 1066 (2004) (*Cheryl Terry Enterprises*), the nonunion plaintiff school bus company claimed an antitrust violation after the defendant, the city of Hartford, rejected its lowest bid on a contract subject to competitive bidding and awarded the contract to a union bidder who had submitted a higher bid. We concluded that "the legislature expressly has conferred standing on a broad range of individuals under the [Connecticut Antitrust] [A]ct, including unsuccessful bidders in a municipal bidding process." Id., 632. In the present case, ECI, like the plaintiff in *Cheryl Terry Enterprises*, also had its low bids rejected on contracts subject to competitive bidding. We therefore conclude, as we did in that case, that ECI, as an unsuccessful bidder, has the statutory right to bring an antitrust claim against the city.

The nonstate defendants argue that the holding in *Cheryl Terry Enterprises* does not apply because that case involved allegations regarding a purported anticompetitive conspiracy, not the anticompetitive effects of a PLA, and that the PLA issue falls within the construction industry exception to antitrust legislation created under the National Labor Relations Act, 29 U.S.C. § 151 et seq. (2006). See *Building & Construction Trades Council of the Metropolitan District* v. *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 230, 113 S. Ct. 1190, 122 L. Ed. 2d 565 (1993) (explaining that 29 U.S.C. § 158 [f] "explicitly permits employers in the construction indus-

v. *Connecticut Siting Council*, supra, 286 Conn. 87. In the present case, ECI makes arguments based on persuasive authority to which the nonstate defendants have responded. See *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 439, 994 A.2d 1270 (2010) (issue decided because all parties addressed it in their briefs and at oral argument). Accordingly, we disagree with Justice Harper that ECI's antitrust claim in the present case was inadequately briefed.

try—but no other employers—to enter into prehire [PLAs]"). The nonstate defendants also argue that a validly bargained for PLA is not subject to antitrust scrutiny pursuant to General Statutes § 35-31 (b), which provides qualified immunity for anticompetitive conduct specifically required or directed by state or federal statutes, and that, in order to avoid this exception, the plaintiffs had to plead and prove that the PLA was not the result of a valid collective bargaining process, which they failed to do. We disagree.

The holding in *Cheryl Terry Enterprises* applies to "unsuccessful bidders in a municipal bidding process" and is not limited in the manner suggested by the nonstate defendants. *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, supra, 270 Conn. 632. Moreover, to the extent the nonstate defendants contend that the PLA issue falls within the construction industry exception, the plaintiffs do not challenge the legality of the PLA or the process by which it was negotiated but, rather, the fact that it was included in the mandatory bid specifications with which all prospective bidders, union and nonunion alike, were required to comply. Finally, with respect to the applicability of § 35-31 (b), because the city and the state were acting in a proprietary rather than a regulatory capacity; see part IV A of this opinion; they are not subject, under the present facts, to qualified immunity under that statute. Accordingly, we conclude that the trial court improperly determined that ECI lacked standing to prosecute its antitrust claim.

IV

ALTERNATIVE GROUNDS FOR AFFIRMANCE

A

Federal Preemption

The nonstate defendants contend that the trial court's dismissal of the plaintiffs' complaint for lack of standing can be affirmed on the alternative ground that their

claims are preempted by federal labor law. They argue that the PLA is a prehire collective bargaining agreement within the primary jurisdiction of the National Labor Relations Board (NLRB) and that the state has no jurisdiction to resolve the plaintiffs' claims under the principles articulated in *San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), and *Lodge 76, International Assn. of Machinists & Aerospace Workers, AFL-CIO* v. *Wisconsin Employment Relations Commission*, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976) (*Machinists*). The plaintiffs respond that their claims are not preempted by federal labor law and that the nonstate defendants not only misconstrue the claims but misapply well developed federal and state precedent. We agree with the plaintiffs.

The following additional facts are relevant to our resolution of this issue. During the proceedings in the District Court on the defendants' motions to dismiss, certain of the nonstate defendants argued, inter alia, that the plaintiffs' claims were preempted by federal labor law, namely, § 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185, and the preemption doctrines articulated in *Garmon* and *Machinists*. The District Court concluded, however, that § 301 did not preempt the plaintiff's claims[41] and that it was not neces-

---

[41] The court explained: "Although claims under § 301 . . . in fact, are claims that are completely preempted and must be heard in a federal forum, there are no such claims in this case, as I understand it. . . .

"Section 301 [provides that] . . . 'state law is preempted insofar as resolution of the state law claim requires the interpretation of a collective bargaining agreement.' . . . Section 301 preemption does not apply for at least two reasons.

"First, I do not believe that interpretation of a collective bargaining agreement or other labor agreement is required in this case. Referral to that agreement, reference to it, reading it, understanding what it says is required. It is not required that the judge hearing this case interpret . . . a labor agreement.

"Moreover, § 301 preemption occurs in a case where parties to a collective bargaining agreement disagree about their rights or obligations under that

sary to rule on whether the *Garmon* or *Machinists* doctrines applied because "neither of those types of preemption require[s] that the preempted claim be heard in federal court. Rather, those types of preemption are requirements that federal law govern but . . . state judges are fully able and often do apply federal law . . . . And it seems to me, therefore, that the arguments made about whether some of these claims are or are not preempted by federal law are claims that or arguments that must be made in state court following remand." On remand, the trial court stated in its memorandum of decision that it would "not reach and decide the alternative grounds advanced in support of the defendants' motions to dismiss" in light of its conclusion that the plaintiffs lacked standing to prosecute the action on other grounds.

We begin with a brief explanation of the principles set forth in *Garmon* and *Machinists*. "Although the [National Labor Relations Act] itself contains no express pre-emption provision, [the United States Supreme Court has] held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy. The first, known as *Garmon* pre-emption . . . is intended to preclude state interference with the [NLRB's] interpretation and active enforcement of the integrated scheme of regulation established by the [National Labor Relations Act]. . . . To this end, *Garmon* pre-emption forbids [s]tates to regulate activity that the [National Labor Relations Act] protects, prohibits, or arguably protects or prohibits. . . . The second, known as *Machinists* pre-emption, forbids both the [NLRB] and [s]tates to regulate conduct

---

agreement, and that is simply not what we have in this case. We don't have a union or union member suing an employer or vice versa. Rather, we have a disappointed bidder suing a number of parties and claiming that the obligation in the bid documents to use union labor is unlawful. That simply is not the type of claim that § 301 reaches."

that Congress intended be unregulated because left to be controlled by the free play of economic forces. . . . *Machinists* pre-emption is based on the premise that Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." (Citations omitted; internal quotation marks omitted.) *Chamber of Commerce of the United States of America* v. *Brown*, 554 U.S. 60, 65, 128 S. Ct. 2408, 171 L. Ed. 2d 264 (2008).

The nonstate defendants' first six arguments rely on their interpretation and application of *Garmon*. They contend that the state has no jurisdiction (1) to resolve the plaintiffs' claims that the PLA is "illegal," (2) to regulate or preclude utilization of a PLA on a publicly funded project, (3) to apply state law to regulate an employee's right to join or not to join a union, (4) to regulate the use or application of construction prehire contracts, (5) to apply state law to regulate the use or application of construction subcontracting clauses, and (6) to apply state law to regulate union security provisions. All of the foregoing arguments share the common premise that the imposition of a mandatory PLA bid specification is within the category of activities that the National Labor Relations Act protects, prohibits, or arguably protects or prohibits. See *Chamber of Commerce of the United States of America* v. *Brown*, supra, 554 U.S. 65. The nonstate defendants also argue that the plaintiffs' claims are barred under *Machinists*.

The plaintiffs respond that they are not asking the court to interpret the PLA requirement or to apply it in any manner that affects labor relations between employers and their employees but are merely asking the court to take full cognizance of the disparate effects of the PLA, to understand its provisions, and to deem its mandatory application to all contractors, subcontractors and field labor working on the projects a violation of the competitive bidding laws and state con-

stitutional provisions. The plaintiffs thus argue that neither *Garmon* nor *Machinists* operates to preclude their claims and that the state has jurisdiction under the United States Supreme Court's holding in *Building & Construction Trades Council of the Metropolitan District* v. *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, supra, 507 U.S. 233 (*Boston Harbor*), that a similar PLA bid specification was not preempted by the National Labor Relations Act. We agree with the plaintiffs.

In *Boston Harbor*, an association of nonunion contractors sought to enjoin the enforcement of a mandatory bid specification that required all successful bidders and subcontractors to agree to abide by a PLA negotiated by the Massachusetts Water Resources Authority (MWRA) and the local trade unions. Id., 221–22. The association had challenged the bid specification on multiple grounds, including preemption under the National Labor Relations Act. Id., 223. After summarizing the preemption doctrines articulated in *Garmon* and *Machinists*, the United States Supreme Court concluded: "When we say that the [National Labor Relations Act] pre-empts state law, we mean that [it] prevents a [s]tate from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*. A [s]tate does not regulate, however, simply by acting within one of these protected areas. When a [s]tate owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the [s]tate is not subject to pre-emption by the [National Labor Relations Act], because pre-emption doctrines apply only to state *regulation*.

"Our decisions in this area support the distinction between government as regulator and government as proprietor. We have held consistently that the [National

Labor Relations Act] was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor." (Emphasis in original.) Id., 226–27. In light of this precedent, the court held that the PLA bid specification did not constitute government regulation, and, therefore, it was not subject to preemption under *Garmon* or *Machinists*. Id., 232. The court further explained: "[The PLA bid specification] constitutes proprietary conduct on the part of the [c]ommonwealth of Massachusetts, which legally has enforced a valid [PLA]. As Chief Judge [Stephen] Breyer aptly noted in his dissent in the [First Circuit] Court of Appeals, 'when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing [on] the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not "regulate" the workings of the market forces that Congress expected to find; it exemplifies them.' . . .

"Because . . . [the PLA bid specification] is not preempted by the [National Labor Relations Act], it follows that a preliminary injunction against enforcement of this bid specification was improper."[42] (Citation omitted.) Id., 232–33.

Although the issue in *Boston Harbor* was limited to whether federal preemption applied to the *enforcement* of an otherwise lawful PLA; see id., 220; the same logic applies to the plaintiffs' state law claims in the present case. Accordingly, we conclude that the plaintiffs' claims are not preempted by federal labor law under

---

[42] The First Circuit Court of Appeals had held that the mandatory PLA bid specification was invalid due to federal preemption under the National Labor Relations Act. See *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.* v. *Massachusetts Water Resources Authority*, 935 F.2d 345, 355 (1st Cir. 1991), rev'd sub nom. *Building & Construction Trades Council of the Metropolitan District* v. *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, supra, 507 U.S. 218.

*Garmon* or *Machinists* because the city was acting in a proprietary capacity as a purchaser of construction services, rather than as a regulator, when it entered into the agreement with the local unions and imposed the mandatory PLA bid specification on successful bidders for the two school construction projects.[43] The District Court made the same observation when it noted that, "in this situation, the [city] is acting like a private purchaser of construction services and is permitted . . . to state a preference for union or, if it were to choose to do so, nonunion labor, just as any other buyer of construction services in the market could. I believe that view is supported by the [United States] Supreme Court's decision in . . . *Boston Harbor*."

Moreover, this is not the only court that has reached such a conclusion. In *George Harms Construction Co. v. New Jersey Turnpike Authority*, 137 N.J. 8, 644 A.2d 76 (1994), the New Jersey Supreme Court, in considering whether New Jersey law prohibited PLAs, observed: "[U]nder *Boston Harbor*, federal labor law does not prohibit a state entering the construction market from using the same construction-industry exception regarding [PLAs] that private purchasers of construction labor use. However, a state's laws may prohibit a [PLA] specification in public contracts without running afoul of the [National Labor Relations Act]. *Garmon* preemption does not apply because a state-law prohibition of [PLAs] on public projects is merely one way in which a state may choose to act as a market participant in the construction industry. In other words, a state may choose

---

[43] We are not persuaded by the contrary view in any of the supplemental authorities urged by the nonstate defendants. See *Tri-M Group, LLC* v. *Sharp*, 638 F.3d 406, 418–26 (3d Cir. 2011); *Johnson* v. *Rancho Santiago Community College District*, 623 F.3d 1011, 1023–29 (9th Cir. 2010), cert. denied sub nom. *Bertalan* v. *Rancho Santiago Community College District*, U.S. , 131 S. Ct. 2096, 179 L. Ed. 2d 891 (2011); *Building Industry Electrical Contractors Assn.* v. *New York*, Docket No. 10 Civ. 8002 (RPP), 2011 U.S. Dist. LEXIS 86759, \*17–\*35 (S.D.N.Y. August 5, 2011).

to enter or not to enter a [PLA] just like any other purchaser of construction services. *Machinists* preemption also does not apply because a state-law prohibition of [PLAs] on public projects does not constitute impermissible regulation of an area that the [National Labor Relations Act] contemplated would be left to the free play of economic forces. Such a prohibition amounts to nothing more than the public equivalent of a corporation's [bylaw] regarding the purchase of construction services. In short, when a state uses [PLAs] on public projects, it is not acting as a regulator of private actors; rather, it is merely defining its role as a proprietor/purchaser of labor in the construction industry. Thus, because the [National Labor Relations Act] does not preempt the field, [it] must [be] determine[d] whether New Jersey law prohibits [PLAs]." Id., 26–27.

The nonstate defendants argue that the plaintiffs in the present case asked the trial court to apply state law to preclude a public entity's right to utilize a PLA on a publicly funded construction project but that the United States Supreme Court has noted that denying a public entity the option to utilize a PLA, such as one available to a private owner or developer, places restrictions on Congress' intended free play of economic forces that the court identified in *Machinists*. The nonstate defendants thus argue that such a regulatory effort arguably falls within the *Machinists* doctrine and that the lower court lacks jurisdiction to hold the PLA " 'illegal,' " as the plaintiffs have urged. The nonstate defendants, however, misconstrue the plaintiffs' claim. The plaintiffs are not claiming that a public entity should be precluded from utilizing a PLA on a publicly funded construction project but that the mandatory application of a PLA requirement to all contractors, subcontractors and field labor working on the school construction projects in this case and on other public school construction projects in Connecticut is a violation of the competitive

bidding laws and state antitrust law. Accordingly, the plaintiffs' claim does not fall within the purview of *Machinists*, as the nonstate defendants contend, and we conclude that federal law does not preempt their state law claims. For this reason, we reject the nonstate defendants' alternative ground for affirmance of the trial court's judgment.

## B

### Sovereign Immunity

The state defendants claim that the trial court's dismissal of the plaintiffs' complaint for lack of standing can be affirmed in part on the alternative ground that the plaintiffs' claims against them[44] are barred by the doctrine of sovereign immunity. The plaintiffs respond that the state defendants' sovereign immunity claim cannot be considered because of their failure to file a timely preliminary statement of issues pursuant to Practice Book § 63-4 (a) (1) or a cross appeal pursuant to Practice Book § 61-8. The plaintiffs further argue that, even if this defect is overlooked, sovereign immunity does not protect the state defendants because they clearly intruded on the plaintiffs' constitutionally protected interests and acted in excess of their statutory authority. We conclude that the state defendants' sovereign immunity claim is not barred by the untimely filing of their preliminary statement and that their claim succeeds on its merits.

The following additional facts are relevant to our resolution of this claim. As previously noted, the trial court stated in its memorandum of decision that it would "not reach and decide the alternative grounds advanced in support of the defendants' motions to dismiss because . . . the plaintiffs lack[ed] sufficient

---

[44] Counts one, four, five, six, nine and ten of the ten count second amended complaint apply to the state defendants as well as certain of the nonstate defendants.

interest in the outcome of [the] controversy to justify deciding the issues thereby presented on the basis of their advocacy." Thereafter, the state defendants did not file a preliminary statement of issues within the required twenty days of the plaintiffs' filing of their preliminary statement of issues but waited more than seven months before filing a document entitled, "Defendants' Amended Preliminary Statement of the Issues," in which they identified as the sole issue whether the plaintiffs' claims were barred by the doctrine of sovereign immunity. They also did not file a cross appeal.

We first consider the plaintiffs' claim that the untimeliness of the state defendants' preliminary statement of issues and their failure to file a cross appeal are fatal procedural flaws. Practice Book § 63-4 (a) (1) provides in relevant part: "If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues.

"Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue."

Practice Book § 61-8 provides: "Any appellee or appellees aggrieved by the judgment or decision from which the appellant has appealed may jointly or severally file a cross appeal within ten days from the filing of the appeal. Except where otherwise provided, the filing and form of cross appeals, extensions of time for filing them, and all subsequent proceedings shall be the same as though the cross appeal were an original appeal. No entry or record fee need be paid." We conclude that neither rule of practice precludes this court's consideration of the state defendants' sovereign immunity claim.

With respect to the untimely filing of the preliminary statement of issues, we concluded in *Mickey* v. *Mickey*, 292 Conn. 597, 603 n.9, 974 A.2d 641 (2009), in which the procedural issues raised by the appellee as alternative grounds for affirmance had not been identified in the required preliminary statement, that, although the record did not indicate that the appellee had filed a preliminary statement, we nonetheless would review the issues because the appellant had not been prejudiced by the lack of such a statement. In the present case, the state defendants filed the required preliminary statement but the filing was merely untimely. Moreover, the plaintiffs have not argued that the untimely filing was prejudicial, and we see no reason why they would be prejudiced by our review of the state defendants' claim. See Practice Book § 63-4 (a) (1) ("[w]henever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue"). Accordingly, we conclude that the untimely filing of the state defendants' preliminary statement of issues does not bar review of their sovereign immunity claim.

With respect to the state defendants' failure to file a cross appeal, there would have been no reason for them to do so because they were not aggrieved by the trial court's dismissal of the plaintiffs' action. We thus proceed to consider the merits of the sovereign immunity claim.

We begin with the governing legal principles. "Sovereign immunity relates to a court's subject matter jurisdiction over a case . . . and therefore presents a question of law over which we exercise de novo review. . . . The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . It has deep roots in this state and our legal system in general, finding its origin in ancient common law. . . . Not only have we recog-

nized the state's immunity as an entity, but [w]e have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state. . . . Exceptions to this doctrine are few and narrowly construed under our jurisprudence." (Internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law*, 284 Conn. 701, 711, 937 A.2d 675 (2007). The presumption of sovereign immunity is not absolute and may be overcome "(1) when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity . . . (2) when an action seeks declaratory or injunctive relief on the basis of a substantial claim that the state or one of its officers has violated the plaintiff's constitutional rights . . . and (3) when an action seeks declaratory or injunctive relief on the basis of a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the officer's statutory authority." (Citations omitted.) Id., 720. "In making this determination, this court has recognized the well established principle that statutes in derogation of sovereign immunity should be strictly construed. . . . [When] there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity." (Internal quotation marks omitted.) Id., 712.

In light of our conclusion in part III B of this opinion that the individual plaintiffs lack standing, and because the plaintiffs do not challenge the state defendants' sovereign immunity claim on the ground of legislative waiver, the only remaining issue is whether the state defendants fall within the sovereign immunity exception that they acted in excess of their statutory authority on the basis of the allegations in counts one and six of the plaintiffs' complaint. In this regard, the state defendants argue that they have not waived sovereign

immunity because § 10-287 imposes a mandate on municipalities, not on the state defendants, to select the lowest responsible qualified bidder. Given the state's lack of participation in the bid selection process, the state defendants contend that there is no statutory duty that they exceeded with respect to the school construction projects. They argue that their conduct, as alleged in the complaint, is far too attenuated, remote and unrelated to the underlying issues to strip them of their sovereign immunity. They further point out that, on its face, the complaint alleges only that the state defendants "allow[ed]" the PLA to be implemented and applied to the school construction projects and, consequently, that the complaint falls short of alleging that they acted in excess of their statutory authority.

The plaintiffs respond that the state defendants were not insignificant participants in the bidding process because § 10-287[45] requires the department to oversee

---

[45] General Statutes § 10-287 provides in relevant part: "(b) (1) All orders and contracts for school building construction receiving state assistance under this chapter, except as provided in subdivision (2) of this subsection, shall be awarded to the lowest responsible qualified bidder only after a public invitation to bid . . . .

"(2) All orders and contracts for architectural or construction management services shall be awarded from a pool of not more than the four most responsible qualified proposers after a public selection process. Such process shall, at a minimum, involve requests for qualifications, followed by requests for proposals, including fees, from the proposers meeting the qualifications criteria of the request for qualifications process. . . . Following the qualification process, the awarding authority shall evaluate the proposals to determine the four most responsible qualified proposers using those criteria previously listed in the requests for qualifications and requests for proposals for selecting architectural or construction management services specific to the project or school district. Such evaluation criteria shall include due consideration of the proposer's pricing for the project, experience with work of similar size and scope as required for the order or contract, organizational and team structure for the order or contract, past performance data, including, but not limited to, adherence to project schedules and project budgets and the number of change orders for projects, the approach to the work required for the contract and documented contract oversight capabilities, and may include criteria specific to the project. Final selection by the awarding authority is limited to the pool of the four most responsible quali-

and administer reimbursement funding for 95 percent of the city's school construction costs. The plaintiffs note that the department must approve project plans and specifications as well as the bidding procedures and that, if the department had determined that mandatory PLAs were impermissible, PLAs would have been eliminated from all taxpayer funded municipal school construction projects. Instead, the plaintiffs argue that the department issued a "letter opinion" in 1997 via the state office of the attorney general providing that PLAs on state funded, municipal school construction projects do not violate § 10-287 and that the department has adopted that policy. The plaintiffs thus contend that, because the state defendants have determined that PLAs are permissible, they have in effect refused to enforce the statutory prescription requiring that awards shall go to the lowest, responsible, qualified bidder. We agree with the state defendants.

fied proposers and shall include consideration of all criteria included within the request for proposals. As used in this subdivision, 'most responsible qualified proposer' means the proposer who is qualified by the awarding authority when considering price and the factors necessary for faithful performance of the work based on the criteria and scope of work included in the request for proposals.

"(c) If the commissioner determines that a building project has not met the approved conditions of the original application, the State Board of Education may withhold subsequent state grant payments for said project until appropriate action, as determined by the commissioner, is taken to cause the building project to be in compliance with the approved conditions or may require repayment of all state grant payments for said project when such appropriate action is not undertaken within a reasonable time.

"(d) Each town or regional school district shall submit a final grant application to the Department of Education within one year from the date of completion and acceptance of the building project by the town or regional school district. If a town or regional school district fails to submit a final grant application within said period of time, the commissioner may withhold ten per cent of the state reimbursement for such project."

The plaintiffs also refer to the state defendants' authority pursuant to General Statutes § 49-41, which requires that contractors provide to the state or municipality performance bonds for contracts to construct, modify or repair public buildings and public works.

"For a claim under the third exception [to sovereign immunity], the plaintiffs must do more than allege that the defendants' conduct was in excess of their statutory authority; they also must allege or otherwise establish facts that reasonably support those allegations. . . . In the absence of a proper factual basis in the complaint to support the applicability of these exceptions, the granting of a motion to dismiss on sovereign immunity grounds is proper." (Citation omitted; internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law*, supra, 284 Conn. 721.

We conclude that the plaintiffs have failed to allege facts that reasonably support their claims against the state defendants. The principal allegations against the state defendants in the second amended complaint are that "the . . . [department] is providing 90 [percent] of the funding for the entire [p]roject, including the [e]lectrical [b]id [p]ackage, through money paid by Connecticut taxpayers and allocated by the [s]tate [l]egislature" pursuant to §§ 10-287 (b) and 4b-91 (c), which require that contracts shall be awarded to the lowest responsible qualified bidder prequalified under § 4a-100, "[a]t all times relevant hereto, the [department], acting by its [c]ommissioner or his agents, has been aware of [the] [c]ity's . . . actions in imposing [the] mandatory PLA, and has continued to fund the [p]roject nonetheless," and "[b]y implementing [the] PLA, or allowing its implementation, for a public school construction project funded almost entirely by the taxpayers of the [s]tate of Connecticut and also the taxpayers of the [c]ity of Hartford, the [c]ity, the [department] and the [c]ommissioner are undermining the very object and integrity of the public competitive bidding process, and are exhibiting patent favoritism to the trade unions and to union contractors, all to the unfair and severe disadvantage of [nonunion] contractors, such as ECI and its individual plaintiff . . . [nonunion] employees

in this particular instance." Other paragraphs allege that the *city* imposed the PLA requirement, was the "awarding authority" and acted beyond its delegated authority in not awarding the contracts at issue to the lowest, responsible, qualified bidder. These allegations are insufficient to support a claim that the state defendants acted in excess of their statutory authority.

The judgment is reversed insofar as the trial court dismissed the claims of the named plaintiff, Electrical Contractors, Inc., against the defendants city of Hartford, Morganti Group, Inc., Downes Construction Company, LLC, and Custom Electric, Inc., and the case is remanded with direction to deny the motions to dismiss as to those claims and for further proceedings according to law; the judgment is affirmed insofar as the trial court dismissed the claims of the named plaintiff, Electrical Contractors, Inc., against the named defendant, the department of education, and the defendant Mark K. McQuillan, the commissioner of education, and insofar as the trial court dismissed the claims of the plaintiffs Jose L. Gonzalez, Jose G. Maldonado, Dan Czyzewski, Bradley Wheaton, Craig Busca and Sean Smith.

In this opinion ROGERS, C. J., and NORCOTT, PALMER, McLACHLAN and EVELEIGH, Js., concurred.

HARPER, J., concurring in part and dissenting in part. In determining that the named plaintiff, Electrical Contractors, Inc. (ECI),[1] has standing under Connecticut's competitive bidding statutes, the majority opinion departs from the narrowly circumscribed doctrine of standing established by our past cases dealing with these statutes. Our subject matter jurisdiction in this area is inherently limited, and the majority's expansion of that jurisdiction disregards both our own precedent,

[1] See footnote 1 of the majority opinion for a listing of the individual plaintiffs named in this case.

particularly this court's clear and controlling holding in *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 181, 740 A.2d 813 (1999), and the lawmaking authority of the legislature. I further disagree that ECI has adequately briefed its claim under the Connecticut Antitrust Act. General Statutes § 35-24 et seq. Accordingly, I respectfully dissent from these holdings.

I

I agree with the majority that, under settled case law, the question of whether ECI has standing to allege a violation of the competitive bidding statutes turns on whether its claim meets the following standard: ECI "had to establish a colorable claim that: (1) [it] either (a) had submitted a bid or (b) would have submitted a bid but for the alleged illegalities in the bidding process and the precluded bid was functionally equivalent to the project specifications; and (2) *the alleged illegalities amounted to fraud, corruption, favoritism or acts undermining the objective and integrity of the competitive bidding process.*" (Emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 181.

As our case law demonstrates, to fulfill this test's second prong, a plaintiff must make a colorable claim that the bidding process—from the development of project specifications and bidding rules to the application of these to bidders—was tainted by procedural impropriety. The court held that standing was appropriate in *Spiniello Construction Co.* v. *Manchester*, 189 Conn. 539, 545, 456 A.2d 1199 (1983), for example, because the defendant allegedly had accepted an irregular bid based on an oral rule addendum communicated only to one bidder, precluding other bidders from competing on equal terms. Conversely, in *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 499, 505, 467

A.2d 674 (1983), this court concluded that the plaintiff lacked standing to challenge the rejection of its lowest bid for failure to include a handwritten signature on the bid document because the signature requirement—however arbitrary or detrimental to the plaintiff—was uniformly applied and there was no showing of fraud or favoritism. This court reiterated the decisive significance of procedural irregularity in *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 696, 600 A.2d 1019 (1991), when it determined that an evidentiary hearing was required to determine whether the plaintiff's claim implicated such irregularities. There, the plaintiff had alleged that the state favored one vendor over others by using information it received from that vendor to draft requests for proposals that could be fulfilled only by that vendor and by providing information relevant to the requests exclusively to that vendor. Id., 691. The court concluded that this result—a single source bid specification—was not inherently illegal but that it would be invalid if it were *intended* to benefit the specific vendor rather than the public. We held that the plaintiff was entitled to an evidentiary hearing to determine whether it had standing under this standard. Id., 695–96. In *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 169, the court concluded that unsuccessful bidders lacked standing to challenge the legality of a project labor agreement. The court concluded, inter alia, that the issue of standing turned not on whether some bidders were effectively excluded but on whether the bidding process was applied consistently and in good faith. Id., 189.

Here, ECI's long list of grievances; see footnote 23 of the majority opinion; fails to allege *any* of the features of procedural impropriety we previously have considered significant. There is no claim of informational asymmetry such that some bidders knew more than others, no claim that the defendants, the city of Hart-

ford, the state department of education and its commissioner, and four other entities,[2] engaged in secret communications with any bidders, no suggestion that the defendants applied rules differently to some bidders than to others, no claim that officials acted in bad faith. Instead, ECI premises its complaint on the fact that all bidders, "union" and "nonunion" alike, were subjected equally to the same bidding terms and requirements and that the defendants did not exempt ECI from that process. Rather than procedural irregularity, which ECI effectively requests rather than protests, ECI's central complaint appears to be based on the ultimate economic harm it allegedly will sustain because the project labor agreement requirements put it at a competitive disadvantage, effectively precluding it from being a successful bidder on public contracts. To tether this complaint to the purposes of the competitive bidding statutes, ECI further alleges that by requiring bidders to perform all project work with union labor under the terms of a project labor agreement, nonunion contractors, whose business models are based on maintaining a labor supply outside of the union system, are disadvantaged in their ability to successfully bid and thereafter perform. As a result, ECI argues, the project labor agreement decreases competition for the project and increases the project's costs to the public.

As the trial court properly recognized, this claim is essentially identical to one this court rejected in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 169, a case in which ECI also was a plaintiff as a subcontractor to the named plaintiff. In that case, we explained: "The crux of the association's claim is that its general contractor members were precluded from participation in the bid process because the project labor agreement requirement imposed costs

---

[2] See footnotes 3 and 4 of the majority opinion for a complete listing of the defendants in this case.

upon nonunion general contractors that made it economically unfeasible for them to bid. As a result, the association argues, general contractors and the association have standing to challenge the project labor agreement as a specification that . . . arbitrarily and anticompetitively limits access to the bidding process. The association contends that limiting the number of potential bidders violates not only the integrity of competitive bidding but also injures the general public by driving up the cost of government funded projects." Id., 187.

Our reasoning in that case for concluding that such a claim did not provide a basis for standing bears repeating, as it applies with equal force to the present case: "Even assuming that the project labor agreement requirement might increase the project's cost, we know of no requirement in the competitive bidding statutes that propels cost considerations to the top of the list of appropriate considerations for public contract specifications. If cost alone were the determinative factor of appropriate bid criteria, disappointed bidders or nonbidders would have virtually unlimited opportunities to litigate project specifications on the ground of alternate designs, materials, safety requirements and so on. Such litigation would involve courts in comparative cost assessments that would severely impair the discretion of governmental bodies entrusted with the responsibility for governmental construction projects. It is neither unusual nor unfair for project specifications to give some potential bidders an economic advantage over others because of factors such as the bidder's expertise, specialization and reliability.

"The claim made by the [named plaintiff] . . . is much more sweeping than the one that we recognized in *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 690–91. The objection to the specification in *Unisys Corp.* was not that [equipment from the defendant Inter-

national Business Machines Corporation] would be more expensive, but that vendors of functionally equivalent hardware or software had been excluded from the bidding process. Id., 691, 695. Our focus was not on the possibility that a particular specification might limit the number of eligible bidders, but on whether the specification necessarily had an adverse impact on the integrity of the bidding *process*. See id., 696.

"As the trial court observed, the record . . . demonstrates a nondiscriminatory decision by the city to use a project labor agreement, in the public interest, to avoid delays in the project and to recruit and maintain the necessary workforce. The court reasonably determined that the city's legitimate business decision fell within the bounds of the discretion afforded to the city by our competitive bidding statutes.[3]

"In conclusion, we reiterate our adherence to the boundaries of the standing principles established in our existing competitive bidding case law. . . . The determinative factor [under that case law] . . . was not whether some bidders had been precluded from the bidding process but *whether the requirements in that process had been applied consistently and in good faith.* . . . That, essentially, is what has occurred in the present case as well." (Citations omitted; emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187–89.

The reasoning and conclusions articulated in *Connecticut Associated Builders & Contractors* dictate the result here, and I am unconvinced by the majority's

---

[3] In the present case, there is evidence in the record supporting the legitimacy of this decision. The record reflects that project labor agreements had yielded successful results in other projects in the state. Moreover, regardless of whether conditions are such that this particular project labor agreement will yield the same result, it cannot be said that the objective of the defendant city of Hartford in requiring this project labor agreement is antithetical to the purpose of the competitive bidding statutes.

attempts to distinguish the present case from it and to diminish its precedential effect. The majority emphasizes that the court in *Connecticut Associated Builders & Contractors* did not reach the merits of the plaintiffs' claim, but that fact is irrelevant; the court in that case properly did not reach the merits because it lacked jurisdiction. The court articulated at length the reasons why it lacked subject matter jurisdiction to consider the merits given the limited basis for standing in this area, and these reasons equally should preclude reaching the merits of the claim in the present case. Like the plaintiffs in *Connecticut Associated Builders & Contractors*, ECI has failed to make any colorable factual showing of *procedural* impropriety. Although ECI has proffered arguably relevant evidence regarding the ultimate financial consequences of the project labor agreement, as the plaintiffs in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187 n.12, apparently did not, evidence of a problematic outcome is alone inadequate for purposes of showing procedural impropriety under our settled case law and under the reasoning of that case.

The subsequent enactment of prequalification requirements under General Statutes § 4a-100, moreover, does nothing to disturb the court's reasoning in *Connecticut Associated Builders & Contractors*. That statute has absolutely no bearing on what may be included in the specifications of a public project, such as a project labor agreement,[4] and it creates no new

[4] The majority's approach to cost appears to conflate two distinct levels of cost consideration: first, the specifications of a project—a building's location, its size, the specific construction materials, the time to completion, permissible levels of noise or pollution, etc.—dictate in broad terms what a project will cost. After those specifications are set, the competitive bidding process allows a public entity to find the contractor who will satisfactorily perform the prespecified project at the lowest price. Section 4a-100 plays a role in determining who may participate in this second level bidding process, but it is wholly unrelated to the initial development of project specifications at the first level. ECI here seeks to challenge not the process of submitting bids but the legitimacy of a mandated specification of the

basis for standing in relation to the competitive bidding laws. Indeed, to the extent this statute relates to standing at all, it would seem to *limit* the field of prospective bidders who could satisfy the first prong of the standing test to those who are prequalified for the project, not to expand the scope of the second prong of that test.

project itself, namely, that contractors abide by a project labor agreement. ECI expressly refused to comply with this specification, and consequently it was by definition not the lowest bidder on the project specified by the defendants. ECI's claim in the present case essentially asks us to nullify that specification in order to render its low bid compliant on the ground that the specification increases the project's cost. Not only is this claim unrelated to § 4a-100, but the court in *Connecticut Associated Builders & Contractors* already has spoken directly to this issue: "[W]e know of no requirement in the competitive bidding statutes that propels cost considerations to the top of the list of appropriate considerations for *public contract specifications*. If cost alone were the determinative factor of appropriate bid criteria, disappointed bidders or nonbidders would have *virtually unlimited opportunities to litigate project specifications on the ground of alternate designs, materials, safety requirements and so on.*" (Emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 187–88.

The potentially absurd results invited by the majority's undifferentiated emphasis on cost may be illustrated by considering a hypothetical challenge under the competitive bidding statutes to a public project based on material, rather than labor, costs. Suppose a public entity solicits bids to construct a building with a slate roof, rather than an asphalt shingled roof. The decision to specify the roofing materials is made on the basis of desired longevity, aesthetic preference, or arbitrary whim. Slate is much more difficult to work with than asphalt, and only a subset of contractors possess the skill and access to materials needed to work with slate efficiently. Other contractors, who out of habit, aesthetic preference, or chance do not typically work with slate, are therefore, as ECI here complains, placed at a significant competitive disadvantage because of the specified material input. Under the logic of the majority opinion, if a "non-slate" contractor were to submit a low bid, conditional on being allowed to construct the roof from asphalt, and the bid were rejected, the disappointed noncompliant bidder would have standing to bring an action based on a claimed violation of competitive bidding laws by asserting that requiring slate roofs would decrease competition and increase the costs to the public. This is plainly nonsensical and inconsistent with the limited grounds of standing permitted under existing Connecticut legislation. There might be reason to doubt the wisdom of insisting on a slate roof, particularly if the decision is the product of arbitrary whim, and there may be cause for questioning the mandated use of arguably more expensive union labor. But under the present constitutional division

I further disagree with the majority's characterization of the comprehensive discussion of this issue in *Connecticut Associated Builders & Contractors,* which constituted one of the two grounds on which the court in that case concluded that it lacked subject matter jurisdiction, as "nothing more than dicta." The court declared at the outset of its analysis that "the plaintiffs did not establish that the general contractor members of the association had met *either part* of this test." (Emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford,* supra, 251 Conn. 186. The two prongs of our test in *Connecticut Associated Builders & Contractors* are both threshold jurisdictional requirements that must be met for a plaintiff to have standing to pursue a hearing on the merits, and the trial court in the present case plainly held that neither was satisfied.[5] Sensible jurisprudence and weighty authority strongly support the proposition, consistent with this court's past practice,[6] that "when two independent reasons are given to support a judgment, the ruling on neither is obiter [dictum], but each is the judgment of the court and of equal validity with the other."[7] (Internal quota-

of power, in the absence of a colorable claim of procedural corruption, these are judgments to be made by the legislature, not by this court.

[5] For this reason, I am not swayed by the majority's citation to *Statewide Grievance Committee* v. *Rozbicki,* 211 Conn. 232, 558 A.2d 986 (1989). In the present case, both prongs of the test in *Connecticut Associated Builders & Contractors* speak equally to subject matter jurisdiction, whereas *Rozbicki* refers to a discussion of the merits *following* a finding that jurisdiction was lacking.

[6] See, e.g., *Roth* v. *Weston,* 259 Conn. 202, 789 A.2d 431 (2002) (announcing two-pronged jurisdictional test and concluding, after thorough analysis, that neither prong was met in that case).

[7] See also, e.g., *Woods* v. *Interstate Realty Co.,* 337 U.S. 535, 537, 69 S. Ct. 1235, 93 L. Ed. 1524 (1949) ("where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum"); *United States* v. *Title Ins. & Trust Co.,* 265 U.S. 472, 486, 44 S. Ct. 621, 68 L. Ed. 1110 (1924) ("where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter [dictum], but each is the judgment of the court and of equal validity with the other" [internal quotation marks omitted]); *United States* v. *Bueno,* 585 F.3d 847, 850 n.3 (5th Cir. 2009) ("[t]his circuit follows the rule that alternative

tion marks omitted.) *California* v. *United States*, 438 U.S. 645, 689 n.10, 98 S. Ct. 2985, 57 L. Ed. 2d 1018 (1978).

Nonetheless, even if this discussion were dicta, the reasoning expressed therein would retain its persuasive force. The claim dealt with in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn.

holdings are binding precedent and not obiter dicta" [internal quotation marks omitted]); *Bravo* v. *United States*, 532 F.3d 1154, 1162 (11th Cir. 2008) (providing "[t]hat [an] alternative holding counts because in this circuit additional or alternative holdings are not dicta, but instead are as binding as solitary holdings"); *Pyett* v. *Pennsylvania Building Co.*, 498 F.3d 88, 93 (2d Cir. 2007) ("[a]n alternative conclusion in an earlier case that is directly relevant to a later case is not dicta; it is an entirely appropriate basis for a holding in the later case"); *United States* v. *Fulks*, 454 F.3d 410, 434–35 (4th Cir. 2006) (stating that alternative conclusion in prior case that bears directly on subsequent case cannot be dismissed as dicta); *Natural Resources Defense Council, Inc.* v. *Nuclear Regulatory Commission*, 216 F.3d 1180, 1189 (D.C. Cir. 2000) ("where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other" [internal quotation marks omitted]); *United States* v. *Rohde*, 159 F.3d 1298, 1302 n.5 (10th Cir. 1998) ("[The] alternate holding [was] not dicta. . . . Were this panel inclined to engage in the business of labeling as dicta one of the two alternative grounds . . . it would then confront [the] defendant's failure to demonstrate why that label ought not adhere to the alternative which is innocuous to her theory, rather than to the alternative which undermines it."); *Parsons* v. *Federal Realty Corp.*, 143 So. 912, 920 (Fla. 1932) ("A ruling in a case fully considered and decided by an appellate court is not dictum merely because it was not necessary, on account of one conclusion reached upon one question, to consider another question the decision of which would have controlled the judgment. Two or more questions properly arising in a case under the pleadings and proof may be determined, even though either one would dispose of the entire case upon its merits, and neither holding is a dictum, so long as it is properly raised, considered, and determined."); *QOS Networks, Ltd.* v. *Warburg, Pincus & Co.*, 294 Ga. App. 528, 532–33, 669 S.E.2d 536 (2008) ("A ruling is not dictum merely because the disposition of the case is or might have been made on some other ground. Where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, but the court actually decides all such points, the case is an authoritative precedent as to every point decided, and none of such points can be regarded as having merely the status of a dictum."); *State* v. *Preciose*, 129 N.J. 451, 461, 609 A.2d 1280 (1992) ("[r]ather than treating that discussion of the merits as dicta, we consider it an alternative holding").

178, "raise[d] no new issues of principle with respect to the requirements of standing, either in general or in the particular context of competitive bidding." Rather, the court simply applied established principles developed in previous cases.[8] As I discuss in greater detail in the following discussion, these prior cases carved out an exceptional basis for standing as a vehicle for challenging fraudulent or corrupt official actions, but they also placed strict limits on that standing. The majority exceeds these limits, contravening not only our own precedent but legislative authority as well. The majority's concern with advancing the cost saving goals of competitive bidding laws may be well founded, but it is for the legislature—not the courts—to determine who may enforce those statutes and how. The following outline of the constitutional framework of standing in general and the historical development of our unusual standing jurisprudence with respect to competitive bidding illustrates how the majority's conclusion runs afoul of these significant principles.

The question of standing deals not only with a party's right to seek relief, but also with the fundamental authority of the court to consider an issue: "[i]f a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn.

---

[8] Even while dismissing the reasoning of *Connecticut Associated Builders & Contractors* as mere dicta, the majority invokes that case to justify its holding in the present case: "One need only examine the reasons why the court in *Connecticut Associated Builders & Contractors* concluded that the [named plaintiff] did *not* have standing to understand why ECI in the present case does." (Emphasis in original.) While the majority's assertion nicely demonstrates that it really is possible to have one's cake and eat it too, the argument suffers from a fundamental logical flaw: simply because one set of reasons leads to a particular result, it does not follow that the absence of this reasoning compels a different result. Indeed, it is only by ignoring all past precedent that the majority is able to suggest that the specific reasoning articulated in *Connecticut Associated Builders & Contractors* represents the *only* basis on which standing is properly denied.

186, 207–208, 994 A.2d 106 (2010). This limit on judicial authority is, as the United States Supreme Court has recognized, "a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis* v. *Casey*, 518 U.S. 343, 349, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). We similarly have noted that "subject matter jurisdiction is, with certain constitutional exceptions . . . a matter of statute, not judicial rule making." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 286, 914 A.2d 996 (2007); see Conn. Const., amend. XVIII ("[t]he powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy").

In keeping with these principles, we have ordinarily recognized two grounds upon which a plaintiff may properly have standing to challenge government action: classical, or common-law, aggrievement and statutory aggrievement—standing conferred by statute. As the majority recognizes, ECI plainly does not have standing on either of these grounds. With respect to competitive bidding statutes, however, this court has taken the unusual step of establishing a quasi-statutory basis for standing that invokes the public oriented goals of competitive bidding laws but that is not specifically grounded in the statutory text. For many years prior to creating this new source of standing, this court had recognized that the competitive bidding statutes "are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest."

(Internal quotation marks omitted.) *Austin* v. *Housing Authority*, 143 Conn. 338, 345, 122 A.2d 399 (1956). Under this traditional rubric, this court determined that disappointed bidders did not inherently have statutory standing; *Joseph Rugo, Inc.* v. *Henson*, 148 Conn. 430, 435, 171 A.2d 409 (1961); and in doing so the court noted that "[c]ourts will only intervene to prevent the rejection of a bid when the obvious purpose of the rejection is to defeat the object and integrity of competitive bidding." Id., 434.

In *Spiniello Construction Co.* v. *Manchester*, supra, 189 Conn. 543–45, this court held for the first time that even though public bidding laws create no cause of action for disappointed bidders, such a bidder had standing to pursue a claim that a town had violated these laws by accepting a conditional combined discount bid based on an oral addendum known only to one bidder, precluding other bidders from competing on equal terms. In so holding, we reasoned that "[t]here is a growing trend for courts to permit one who has been aggrieved by a refusal to award a public contract pursuant to lowest responsible bidder provisions to also vindicate the public interest by challenging such arbitrary or capricious action by governmental officials."[9] Id., 545. The court later emphasized the limits of

---

[9] This court's decision in *Spiniello Construction Co.* appears to have been influenced by the adoption of an "injury in fact" basis for standing in the federal courts following the enactment of the federal Administrative Procedure Act, 5 U.S.C. § 500 et seq., which in turn was applied to claims challenging federal bidding statutes. Our decision cited several federal court decisions in support of our conclusion. See, e.g., *Scanwell Laboratories, Inc.* v. *Shaffer*, 424 F.2d 859, 865 (D.C. Cir. 1970) (explaining in case addressing public bidding statute, "[t]he law of standing was greatly modified by the passage of the Administrative Procedure Act"); id., 872 ("the Administrative Procedure Act applies to all situations in which a party who is in fact aggrieved seeks review, regardless of a lack of legal right or specific statutory language"). This court has long recognized, however, that "[t]he Connecticut counterpart to [the relevant provision of the Administrative Procedure Act] . . . is much more limited in scope." *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 503. The narrower language of our own Uniform Administrative Procedure Act; General Statutes § 4-166 et seq.;

this holding, explaining that: "In *Spiniello Construction Co.* v. *Manchester*, [supra, 539], we recognized that our prior decisions had the effect of preventing judicial review of potentially meritorious claims concerning the implementation and execution of competitive bidding statutes. We also acknowledged the fact that the group most benefited by the statute—the public—had no effective means of protecting their interests. . . . Thus, we held that where fraud, corruption or acts undermining the objective and integrity of the bidding process existed, an unsuccessful bidder did have standing under the public bidding statute. We limited the scope of our holding in order to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public." (Citations omitted.) *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 504–505.

I am uncertain of the source of authority underlying the court's decision in *Spiniello Construction Co.*[10] Nonetheless, there and in subsequent cases we properly have cleaved to the long-standing principle that "[c]ourts will only intervene to prevent the rejection of a bid when the obvious *purpose* of the rejection is to defeat the object and integrity of competitive bidding." (Emphasis added.) *Joseph Rugo, Inc.* v. *Henson*, supra, 148 Conn. 434. Thus, in denying standing in *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 497, the court explained the factors that led to a different

plainly does not confer on courts the authority to adopt an "injury in fact" standing analysis, and we have not adopted a similarly expansive standard for standing to bring claims under any other statutory scheme.

[10] This court has held that as a matter of formal authority, where "subject matter jurisdiction is created by statute . . . we have no power to enlarge or circumscribe it." *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 763, 628 A.2d 1303 (1993); id. (time window for statutorily created right of appeal not subject to judicial modification).

result than in *Spiniello Construction Co.*: "There, the municipality had imparted information to one bidder that it had not provided other bidders. . . . Thus, parity of information no longer existed among the bidders as envisioned by the statute. In this case . . . [t]he construction company which received the contract award was not given any special advantage over the plaintiff in submitting its bid, nor was it privy to any secret information. . . . The [commissioner of administrative services (commissioner)] did not apply its requirement inconsistently or in a discriminatory fashion. Nor was there any proof that the commissioner was acting in bad faith." (Citation omitted.) Id., 505–506. The question of whether standing was appropriate, the court concluded, turned not on the inherent logic or illogic of the underlying bidding terms but on the presence of inconsistency or discrimination in the *process* of crafting and applying those terms.

In *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 696, the court reiterated the significance of procedural irregularities, noting that "[requests for proposals] are not necessarily illegal merely because the specifications of the [requests] can be met by only one vendor. . . . [M]ore must appear in order to render the specifications and the contract based thereon illegal . . . . [A]n objectionable and invalidating element is introduced when specifications are drawn to the advantage of one manufacturer not for any reason in the public interest but, rather, to insure the award of the contract to that particular manufacturer." (Internal quotation marks omitted.) Id. As this court later underscored in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 188, "[o]ur focus [in *Unisys Corp.*] was not on the possibility that a particular specification might limit the number of eligible bidders, but on whether the specification necessarily had an adverse impact on the integrity of the bidding process." The

court in *Unisys Corp.* v. *Dept. of Labor*, supra, 695–96, drew no ultimate conclusion as to standing, holding only that these allegations raising specific claims of information disparity involving one particular competitor were sufficient to warrant an evidentiary hearing.[11]

As I previously have noted, in *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 169, this court reaffirmed these limits on jurisdiction. The court announced: "In conclusion, we reiterate our adherence to the boundaries of the standing principles established in our existing competitive bidding case law. . . . The determinative factor, we held [in *Ardmare Construction Co.*], was not whether some bidders had been precluded from the bidding process but whether the requirements in that process had been applied consistently and in good faith. . . . That, essentially, is what has occurred in the present case as well." (Citations omitted.) Id., 188–89.

I find troubling the majority's abandonment of these "boundaries of the standing principles established in our existing competitive bidding case law"; id., 188; that plainly underlie the reasoning of *Connecticut Associated Builders & Contractors* and its predecessors. ECI complains not about procedural corruption but, rather, about discriminatory effect. As we explicitly held in

[11] The majority, in footnote 17 of its opinion, notes that evidentiary hearings are atypical in motions to dismiss and expresses some doubt regarding whether a hearing was appropriate here. While I agree with the majority's general statement of law, this court has stated with respect to competitive bidding statutes: "Although the plaintiffs were not required to prove the merits of their claim, they did have the lesser burden of establishing a colorable claim. . . . Under the test for standing set forth in *Unisys Corp.*, *Ardmare Construction Co.* and *Spiniello Construction Co.*, the trial court was *required* to conduct an evidentiary hearing to decide whether the plaintiffs had established a colorable claim that the project labor agreement requirement had undermined the integrity or objectives of the competitive bidding process." (Citation omitted; emphasis added.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 182.

*Unisys Corp.*, however, even the most extreme form of discriminatory effect—a purchase order designed to be fulfilled only by a *single* possible bidder—does not alone create a basis for standing. ECI has failed to allege anything more than an unequal effect of an evenhanded process, and to permit standing on that basis would be an exercise of power we do not properly possess. I am mindful that cost control undoubtedly is an important goal of the competitive bidding statutes. But it is for the legislature to determine which costs are subject to challenge under the statutes and by whom.

## II

ECI's claim to standing under Connecticut's antitrust statutes does not suffer from the significant statutory and jurisprudential barriers discussed in part I of this concurring and dissenting opinion. In sharp distinction to the plain absence of a private cause of action under the competitive bidding statutes, "the legislature expressly has conferred standing on a broad range of individuals under the [Connecticut Antitrust Act (act)], including unsuccessful bidders in a municipal bidding process."[12] *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 270 Conn. 619, 632, 854 A.2d 1066 (2004). Moreover, General Statutes § 35-28 explicitly forbids every "contract, combination, or conspiracy . . . [that] are for the purpose, or have the *effect,* of" violating the act. (Emphasis added.) The act thus clearly confers standing on disappointed bidders to pursue a theory of liability based on harmful effects.

Nonetheless, I would conclude that ECI's claim is inadequately briefed and that we should withhold judgment on this complex issue until it is properly presented

---

[12] General Statutes § 35-35, for example, provides in relevant part that "*any person . . . injured* in its business or property by any violation of the provisions of this chapter shall recover treble damages . . . ." (Emphasis added.)

to us. The act implicates both state and federal legislative schemes; see *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 72–73, 793 A.2d 1048 (2002) ("[t]he legislature amended the [act] in 1992 to make explicit its intent that the judiciary shall interpret the [act] in accordance with the federal courts' interpretation of federal antitrust law"); and it contains important exceptions pertaining to, among other things, organized labor. See General Statutes § 35-31. The trial court's memorandum of decision did not articulate that court's reasons for denying standing on this claim, and ECI's appellate brief does little more than identify the relevant statutes and point to three unilateral acts by the defendant city of Hartford: imposing the project labor agreement on all bidders for the project, imposing the project labor agreement on nonunion workers and refusing to award the contract to ECI. ECI also identifies this court's holding in *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, supra, 270 Conn. 623, in which we accorded standing to a disappointed low bidder who claimed that "it was not awarded the contract due to a conspiratorial agreement between a [labor] union and the defendant [city], with the purpose of obtaining a union contract." ECI, however, does not point to any such conspiratorial agreement either in its complaint at the trial court or in its brief on this issue.[13] "It is well-settled that an individual or corporation cannot alone contract, combine, or conspire to violate the antitrust laws. Thus, 'a violation of [§] 35-28 . . . requires a plurality of actors.' *Shea* v. *First Federal Savings & Loan Association of*

---

[13] In its complaint, ECI does allege that "[u]nlike its union contractor competitors, ECI never participated in the collective bargaining agreements and negotiations that resulted in . . . the [project labor agreement] . . . ." It is unclear, however, what significance this allegation has for purposes of the antitrust claim. As the majority notes, ECI "[does] not challenge the legality of the [project labor agreement] or the process by which it was negotiated but, rather, the fact that it was included in the mandatory bid specifications with which all prospective bidders, union and nonunion alike, were required to comply."

*New Haven*, 184 Conn. 285, 306, [439 A.2d 997] (1981)
. . . ." (Citations omitted.) *McKeown Distributors, Inc.* v. *Gyp-Crete Corp.*, 618 F. Sup. 632, 645 (D. Conn. 1985). Although a number of contracts and agreements are likely relevant to this litigation, it is unclear which, if any, we should consider as the basis for ECI's claim.

While I would leave open the question of whether a colorable claim of an antitrust violation could be made out from the allegations in ECI's complaint, nonetheless it is improvident to reach any such conclusion on the basis of the underdeveloped record and the lack of adequate attention to this issue by the parties.

Accordingly, I respectfully dissent from these holdings.